*165 OPINION OF THE COURT
Eugene E. Peckham, J.
This case began with submission of findings and judgment for an uncontested divorce in March 2006. The grounds for divorce stated in the complaint were based upon a separation agreement filed in the Delaware County Clerk’s Office on November 12, 2004.
Upon review, that agreement contained the following provisions:
“WHEREAS, the wife is currently expecting, but each of the parties acknowledges that the unborn child is not the biological child of the husband, but was conceived through a mutually agreed upon course of artificial insemination; and “WHEREAS, with respect to the unborn child the parties intend and agree that Peter G. shall in no way be deemed a ‘responsible relative’ in connection with any claim of reimbursement for monies expended by any government agency on behalf of either the unborn child, including after birth expenses, or Laura G., and he shall in no way be financially responsible in any way for said child or to Laura G. on behalf of that child.” (Emphasis added.)
The complaint stated: “There are three children to this marriage: Connor . . .; Breanna . . .; Alyssa. . . .” Alyssa is the unborn child referred to in the separation agreement.
Upon review of the papers submitted for the uncontested divorce, the court determined a law guardian should be appointed to protect the best interests of Alyssa. The law guardian submitted a “Memorandum of Law and Law Guardian’s Recommendation.” In that memorandum she argued in the alternative either that the defendant father should be deemed to be Alyssa’s father because there was substantial compliance with the provisions of Domestic Relations Law § 73 or that the defendant should be required to pay child support because of equitable estoppel or implied agreement to the artificial insemination.
Domestic Relations Law § 73 provides as follows:
“1. Any child born to a married woman by means of artificial insemination performed by persons duly authorized to practice medicine and with the consent in writing of the woman and her husband, *166 shall be deemed the legitimate, natural child of the husband and his wife for all purposes.
“2. The aforesaid written consent shall be executed and acknowledged by both the husband and wife and the physician who performs the technique shall certify that he ha[s] rendered the service.”
Certain facts in this case are not disputed. Defendant is vice-president of a bank (record at 140) and plaintiff is self-employed as a day-care worker at home (record at 37). The parties were married on December 9, 1995. After the first two children were born, Connor and Breanna, defendant had a vasectomy. Subsequently the parties discussed having a third child. In February or March 2004, defendant consulted a doctor about the possibility of reversing the vasectomy. After that consultation he decided not to have it done due to the “medical consequences.” The doctor also told him there were “other avenues” to have a child and that his wife should consult her doctor and he went home and told his wife about it. (Record at 130-131, 198-199.)
On or about April 1, 2004, plaintiff called her doctor’s office and spoke to his nurse and was given phone numbers for sperm banks. (Record at 23.) Thereafter plaintiff contacted the sperm bank and received a document entitled “Frozen Donor Semen Specimen Agreement.” Both plaintiff and defendant signed the agreement and returned it to the sperm bank on or about April 7, 2004. (Law guardian mem, exhibit 2.) Next the plaintiff received catalogs of potential donors listing their characteristics such as hair and eye color. She picked a donor with characteristics similar to her husband. (Record at 69-70, 195-196.) Defendant saw her reviewing the catalogs. (Record at 189-190.) On or about May 2 and 3, 2004, she was inseminated by Dr. Agneshwar and subsequently became pregnant. (Record at 16.) Alyssa was born January 13, 2005. Defendant knew she was going to the doctor to be inseminated and took care of the other two children while she did so. (Record at 204-205.) There was no written consent executed in the manner contemplated by Domestic Relations Law § 73.
After plaintiff became pregnant the parties’ marital difficulties increased to the point that the separation agreement was signed on November 10, 2004. After the separation agreement was signed defendant moved out of the marital residence. (Record at 108.)
As previously stated, the complaint alleged there were three children of the marriage, which was denied in the answer. Just *167 before the uncontested divorce papers were submitted in March 2006, the parties entered into a stipulation dated March 9, 2006, which reaffirmed the separation agreement and then calculated defendant’s obligation for child support based upon two children.
In a letter decision dated October 24, 2006, the court held that the provisions of the separation agreement purporting to absolve defendant from liability for child support for Alyssa were void as against public policy citing Werther v Werther (9 Misc 3d 1114[A], 2005 NY Slip Op 51543[U] [2005]).
A hearing was ordered limited to the issues of child support and paternity for Alyssa. That hearing was held on November 1, 2006 and briefs were submitted thereafter.
Clearly the public policy of New York in custody and support proceedings is that the paramount concern is the best interests of the child. (Domestic Relations Law §§ 70, 240; Matter of Shondel J. v Mark D., 7 NY3d 320 [2006].) The court’s determination of the best interests of the child prevails over any agreement of the parties. “No agreement of the parties can bind the court to a disposition other than that which a weighing of all the factors involved shows to be in the child’s best interests.” (Eschbach v Eschbach, 56 NY2d 167, 171 [1982].) Similarly in Werther the court held:
“In the context of child support, the Court must act as parens patriae, and retains jurisdiction to act in the child’s best interests. Without question, a provision in an agreement eliminating a party’s child support obligation is void as against public policy. . . . Accordingly, that portion of the agreement waiving [the] child support obligation is set-aside.” (9 Misc 3d 11U[A], 2005 NY Slip Op 51543[U], *7; Matter of Perera v Perera, 251 AD2d 885 [3d Dept 1998].)
Three issues are presented for decision: (1) Is strict compliance with the provisions of Domestic Relations Law § 73 required? (2) If strict compliance is not required, has consent of defendant been proved by clear and convincing evidence? (3) Is defendant responsible to pay child support for Alyssa?
Is Strict Compliance with Domestic Relations Law § 73 Required?
In Anonymous v Anonymous (NYLJ, Jan. 18, 1991, at 21, col 6 [Sup Ct, NY County]), it was held that strict compliance with the statute was required. An earlier Appellate Division decision was to the contrary. (State of New York ex rel. H. v P., 90 AD2d *168 434 [1st Dept 1982].) In State ex rel. H. v P. the husband had been determined to be sterile and the wife underwent artificial insemination on 10 occasions, became pregnant and a daughter was born. There was no statement as required by Domestic Relations Law § 73. When marital difficulties arose, the wife claimed the child was conceived “during a dalliance with an unnamed individual on a business trip to California” (at 435). The Court, relying in part on the presumption of legitimacy of a child born during marriage, rejected exclusive reliance on Domestic Relations Law § 73 and held the wife was estopped from denying the husband’s paternity.
Alan Scheinkman, in discussing the Anonymous case in his Practice Commentaries to Domestic Relations Law § 73 says:
“The Anonymous court’s insistence that there be strict compliance with Domestic Relations Law § 73 appears unduly rigid. Where it is clear that the father gave an oral consent or gave a written consent that was defective in form, there seems little reason to illegitimate the child because of a technical defect ... In those situations, it seems inappropriate to allow a husband to evade his commitments to his wife and the child through a technical defect.” (Alan Scheinkman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law § 73, at 311-312.)
Scheinkman also says:
“In its opinion, the Anonymous court noted that the physician who had performed the insemination testified he had performed many inseminations and had never informed any of his patients as to the requirements of Domestic Relations Law § 73. The court wrote that it was apparent that the Legislature had relied upon physicians to advise their patients of the protections that the law would provide.” (Practice Commentaries, supra at 311.)
However, physicians are not providing such advice to their patients. This is confirmed by the testimony of Dr. Agneghwar, the physician who performed plaintiff’s insemination, who clearly had no idea of the statutory provisions and testified he had no forms for the husband or wife to consent to insemination. (Record at 17-18.)
Subsequent to the enactment of Domestic Relations Law § 73 the Legislature adopted amendments to sections 418 and 532 of the Family Court Act regarding use of DNA tests in paternity *169 and. support proceedings. A provision of both those sections is the following: “No such test shall be ordered, however, upon a written finding by the court that it is not in the best interests of the child on the basis of res judicata, equitable estoppel or the presumption of legitimacy of a child born to a married woman.” (Family Ct Act § 418 [a]; § 532 [a]; L 1990, ch 818, § 12; L 1997, ch 398, § 80.)
Both parties agree Alyssa was conceived by artificial insemination and so the court finds there is no need for a DNA test. (Cf. State ex rel. H. v P., supra.) The clear implication of the amendments to sections 418 and 532 of the Family Court Act is that the written consent requirement of Domestic Relations Law § 73 does not apply in paternity and support proceedings where there is a presumption of legitimacy or an equitable estoppel. Since Alyssa was conceived and born during the marriage of the parties, the presumption is that she is the legitimate child of both parties. (Family Ct Act § 417; State ex rel. H. v P., supra.) As will be seen later, equitable estoppel also is applicable to this case.
Neither the statute itself nor the legislative memoranda in the Bill Jacket indicate any requirement that the procedures in Domestic Relations Law § 73 are the only way to establish the legitimacy of a child born by artificial insemination. The fact that strict compliance is not required is demonstrated by the fact that the statute does not have a provision for filing anywhere the written consent set forth in the statute, nor is there any penalty on anyone for failing to follow the statute. (Mem of Attorney General Louis J. Lefkowitz, Bill Jacket, L 1974, ch 303, at 3-4; Assembly Introducer Mem in Support, L 1974, ch 303, at 18.) If the Legislature had intended to make the procedures in Domestic Relations Law § 73 the only way to provide for the legitimacy or support of a child born by artificial insemination it could easily have included such enforcement procedures in the statute, but there are none.
The only conclusion that can be drawn from the legislative history of Domestic Relations Law § 73 and the amendments to Family Court Act §§ 418 and 532 is that consent of the husband can still be proved in the same manner as it was before the statute was passed. At common law a husband was required to support a child conceived by artificial insemination with third-party donor sperm and born during marriage with his consent. There was no requirement of a writing to prove consent. (Matter of Gordon, 131 Misc 2d 823 [Sur Ct, Bronx County 1986].)
*170 This court agrees with Scheinkman that it is inappropriate to illegitimatize a child for lack of strict compliance with the requirements of Domestic Relations Law § 73. Where, as will be seen here, the husband has consented to the insemination procedure, he should not be allowed to deny support to the child that results.
It is held that strict compliance with the procedure set forth in Domestic Relations Law § 73 is not required and consent by the husband of a married woman to artificial insemination may be proved by other clear and convincing evidence.
Is There Clear and Convincing Proof of Consent by Defendant?
Plaintiff testified several times, both on direct and cross-examination, that the defendant absolutely agreed both to artificial insemination and to having a third child. (Record at 50-51, 62, 64, 67-68.) This is confirmed to some extent by the testimony of Nurse Glenn. (Record at 22-23, 31.)
Plaintiffs actions were not totally consistent, as she admits that she signed the separation agreement and a later stipulation with its provision that her husband was not responsible for the child. She explained this in her testimony as follows:
“Q: Okay. There was no provision in the separation agreement for any custody, joint custody or any kind of visitation, is there?
“A: He didn’t want to be her father, he said at that point, so I said you can’t make someone be a father so I wasn’t going to push it. I couldn’t fight him on it. I couldn’t afford to fight him on it. I wasn’t going to push it. I just let it go.” (Record at 75, 83-84.)
Whether or not she agreed to the provisions of the separation agreement relating to Alyssa is not relevant in any event, because, as pointed out above, the court’s determination of the best interests of the child override any agreement of the parents. (Eschbach v Eschbach, supra; Werther v Werther, supra.)
The court finds the testimony of plaintiff to be credible. The testimony of defendant, on the other hand, is not credible as it was evasive and contradictory.
Defendant took the position in his testimony that he felt the marriage was dysfunctional and that they needed to go to counseling before having another child. (Record at 98-99, 133, 185-188.) Yet he never demanded that they do so before having another child. (Record at 188, 192.) He also testified that he told his wife he definitely did not want a third child. (Record at *171 99-100.) Yet many of his other statements and actions contradict these assertions made in his testimony. He may have been reluctant to have a child, but, as his testimony shows, he vacillated, but never flat out refused.
First, he consulted a physician regarding possible reversal of his vasectomy and, when the doctor told him that his wife should see her doctor about other avenues to having a child, he reported that to his wife. (Record at 199.) Second, after plaintiff saw her doctor and presented the “Frozen Donor Semen Specimen Agreement” he signed it. (Law guardian mem, exhibit 2; record at 135-136.) He claims he signed under duress (record at 104), but nevertheless admits that he read the agreement before signing it. (Record at 134.) Third, he also signed the portion of the agreement for payment by credit card and he paid the bills out of their joint checking account. (Law guardian mem, exhibit 2; record at 78-79.) Fourth, after the agreement was returned he knew his wife was reviewing catalogs with donor characteristics and that she picked a donor with characteristics similar to his. (Record at 70-71, 154, 195-196.) Fifth, he knew when she went to the doctor’s appointment to have the insemination performed (record at 140, 200-202) and he did not tell her not to do it. (Record at 201, 207.) He took care of the other two children while she was at the doctor. (Record at 205.) Sixth, after the insemination was performed, despite his objections, he continued to live with his wife and to sleep with her. (Record at 140-142.) Seventh, he read and signed the separation agreement that included the provision stating that Alyssa “was conceived through a mutually agreed upon course of artificial insemination.” (Record at 166.) He was asked at least four times about whether there was a mutual agreement to the insemination and each time he evaded a direct answer to the question. (Record at 106, 139, 166-167, 180-181.) Lastly, after plaintiff became pregnant while they were living together and before they separated, he admitted on cross-examination that he assumed he would take the role of father and never told plaintiff he would not support the unborn child. (Record at 74, 176, 180.)
Plaintiff’s testimony is supported by the testimony of Nurse Glenn and by the documentary evidence, the donor semen agreement and the separation agreement, both of which defendant admitted he read and signed. (Record at 134, 140-142.) As the vice-president of a bank (record at 148) the court must assume he understood what he read in the separation agreement and the frozen donor semen agreement. The court finds that Alyssa *172 “was conceived through a mutually agreed upon course of artificial insemination.” Defendant repeatedly evaded answering directly as to whether that statement was true and correct, which must be held against him. Defendant’s actions, vacillating though they may have been, implied consent to the artificial insemination and his wife testified credibly that he actually did consent. Since Alyssa was conceived and born during the parties’ marriage by an agreed upon insemination the court holds the evidence is clear and convincing that she is the legitimate child of both plaintiff and defendant. (State ex rel. H. v P., supra; Family Ct Act § 417; Domestic Relations Law § 73.)
Is Defendant Responsible to Pay Child Support for Alyssa?
An additional reason for holding defendant responsible to support Alyssa is the doctrine of equitable estoppel. The elements of equitable estoppel are whether there has been representation, reliance and detriment. As just stated by the Court of Appeals:
“The purpose of equitable estoppel is to preclude a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted. The law imposes the doctrine as a matter of fairness. Its purpose is to prevent someone from enforcing rights that would work injustice on the person against whom enforcement is sought and who, while justifiably relying on the opposing party’s actions, has been misled into a detrimental change of position.” (Matter of Shondel J. v Mark D., supra at 326.)
Plaintiff testified that defendant was a very indecisive person and was also indecisive about having another child, but that he agreed to it.
“Q: Is it fair to say defendant did not want to have another child?
“A: He was up in the air. I don’t know for sure that he said no. He was very indecisive.
“Q: Fair to say that he didn’t say yes?
“A: He did say yes. He absolutely said yes, we will have the third child, absolutely.
“Q: When did he say that?
“A: Amongst our discussion to keep our marriage together” (record at 62, 64, 67).
*173 The fact of defendant’s indecisiveness and equivocation is confirmed by his own inconsistent actions and testimony in at least the eight items discussed above. Particularly, this is shown by his evasion of an answer to the question of whether the insemination was mutually agreed upon. (Record at 106, 139, 166-167, 180-181.)
Thus it is clear to this court that plaintiffs testimony that he represented to her that he agreed to having another child by insemination is correct. She relied upon this representation by proceeding with the insemination, pregnancy and birth. The detriment in a legal sense is the birth of the child and the costs of Alyssa’s support. “[P]aternity by estoppel is now secured by statute in New York (see Family Ct Act § 418 [a]; § 532 [a])” (Matter of Shondel J. v Mark D., supra at 326).
The Court of Appeals also said in Shondel J. (at 330) “the issue does not involve the equities between the two adults; the case turns exclusively on the best interests of the child.” It goes without saying that the best interest of Alyssa is to have a mother and a father who both love and support her, or, if that is not possible, at least a father who is obligated to provide child support for her. Defendant is estopped from denying his paternity of Alyssa.
Even if the decision is incorrect that defendant must be treated as Alyssa’s father, he is still obligated to pay child support due to equitable estoppel. For example in Matter of Campbell v Campbell (149 AD2d 866 [3d Dept 1989]) the parties had two children. Subsequently, the father discovered that he was “medically incapable of fathering children” and petitioned to modify his child support (at 867). The Court said he “seeks to bastardize the children for the sole purpose of promoting his own self-interest in avoiding further support payments” and held that the petition to modify support was properly dismissed (id.).
In another unique case a woman who held herself out as a man entered into a marriage with another woman and subsequently they had two children by artificial insemination. She affixed her name to an agreement as the husband stating the children were hers. When the couple split up the court held the woman/husband was estopped and therefore liable for child support based upon her representations. (Matter of Karin T. v Michael T., 127 Misc 2d 14 [Fam Ct, Monroe County 1985].) In similar fashion defendant is estopped from refusing to pay child support as between him and his wife because she relied on his *174 representations to her detriment. (Domestic Relations Law § 240; Family Ct Act § 413; Matter of Shondel J. v Mark D., supra.)
But he is also estopped because of his actions in relation to Alyssa and in her best interests. As previously set forth after plaintiff became pregnant and before they separated, defendant admitted that he would assume the role of father and did not say absolutely he would not support the child. (Record at 73-74, 176, 180.)
Most important is the relationship which has developed between Alyssa and defendant since her birth. Both parties testified she calls him “Daddy Pete.” (Record at 55, 165.) Plaintiff also testified credibly in. answer to questions posed to her on cross-examination:
“Q: Okay. But you say that defendant spends time with Alyssa?
“A: All the time.
“Q: Could you tell me how much time?
“A: Every day.
“Q: How much time every day?
“A: Whenever he’s at the house. He is at the house all the time.
“Q: He’s at your house?
“A: He comes in the door, ‘Where’s my hug, Alyssa?’
Don’t you [referring to defendant] dare lie. Every day.
“Q: Okay.
“A: He comes in her bedroom at night and helps put her to bed.” (Record at 77.)
The Court of Appeals held in Shondel J. v Mark D. (supra at 327), “Where a child justifiably relies on the representations of a man that he is her father with the result that she will be harmed by the man’s denial of paternity, the man may be estopped from asserting that denial.” From plaintiffs testimony it is clear a loving relationship has developed between Alyssa and defendant. Alyssa will be harmed by termination of that relationship. The Court of Appeals stated in Shondel J. that the Appellate Divisions have repeatedly held that where a parent-child relationship has developed the doctrine of equitable estoppel prevents the father from denying the relationship and from refusing to pay child support. (Matter of Sarah S. v James T., 299 AD2d 785 [3d Dept 2002]; Matter of Jennifer W. v Steven X., *175 268 AD2d 800 [3d Dept 2000]; Brian B. v Dionne B., 267 AD2d 188 [2d Dept 1999]; Mancinelli v Mancinelli, 203 AD2d 634 [3d Dept 1994]; Campbell v Campbell, supra.) It is held that defendant is estopped in the best interests of Alyssa and must pay child support for her.
The bottom line is that defendant may have been reluctant to have another child, but he vacillated and never clearly and unequivocally said “no” to his wife. In her testimony she said he said “yes,” and the court finds that testimony believable. Defendant has now made a commitment to his wife and child Alyssa. That commitment must be honored. Since he participated in bringing Alyssa into this world, however reluctantly, he should be held responsible as her father for child support.
Defendant stated his income is $63,000 per year (stipulation dated Mar. 8, 2006), which after subtracting Social Security and child support paid for another child of $60 every two weeks, leaves parental income of $56,620. Plaintiffs income is $20,000 per year (stipulation dated Mar. 8, 2006), which is $18,470 after Social Security. Total parental income after Social Security is $75,090. Defendant’s share of the income is 75% and plaintiffs is 25%. Child support for three children at the Child Support Standards Act percentage of 29% is $21,776 of which defendant’s portion is $16,332 or $314.07 per week. It is therefore ordered that defendant shall pay to plaintiff the sum of $314.07 every week for child support for Connor, Breanna and Alyssa.