[985 NYS2d 845]

WENDY G-M., Plaintiff, v ERIN G-M., Defendant.

Supreme Court, Monroe County, May 7, 2014

**APPEARANCES OF COUNSEL**

*Joanne Best*, Brockport, for plaintiff.
*Jeanne Colombo*, Rochester, for defendant.

**OPINION OF THE COURT**

RICHARD A. DOLLINGER, J.

In this divorce action, a child conceived from artificial insemination was born during the marriage. The court must now determine whether the spouse who did not give birth to the child (the non-biological spouse) is a parent of the child under New York's long-standing presumption that a married couple are both parents of a child born during their marriage.

The birth mother and her spouse were married in a civil ceremony in Connecticut, before New York enacted its Marriage Equality Act (MEA) (L 2011, ch 95).[1] The couple decided to have a child and in October 2011, they both signed a consent

---

**1.** (Domestic Relations Law § 10-a.) The marriage of same-sex couples legally married in other jurisdictions is recognized in New York. (*Martinez v County of Monroe*, 50 AD3d 189 [4th Dept 2008]; *Godfrey v Spano*, 13 NY3d 358 [2009] [holding that executive orders directing county and state civil services to recognize out-of-state same-sex marriages were lawful; concurrence

form agreeing to artificial insemination procedures. In the consent form, the birth mother authorized the physician to perform artificial insemination on her, and the spouse requested the doctor to perform the procedure. The document also reads: "We declare that any child or children born as a result of a pregnancy following artificial insemination shall be accepted as the legal issue of our marriage." The document is signed by the birth mother, the spouse, and the physician, but there is no acknowledgment to the signatures. The spouse paid for the sperm donation and executed a consent form that allowed the purchased sperm to be used for the artificial insemination of the birth mother. Both parties underwent artificial insemination for almost two years, until the procedure succeeded on the birth mother; the spouse then discontinued her treatments.

The fertility clinic records demonstrate that the birth mother and the spouse were both involved in appointments. The spouse attended the pre-birth classes, including breastfeeding, baby care, and CPR classes. The spouse participated in the baby showers. The birth mother celebrated the impending birth through a Facebook posting which said:

> "This is our year!!! Our daughter will lawfully have two mommies when she arrives and a family that's recognized wherever we go in the U.S. I love you!

> "When you go through fertility and have a partner, they have to sign off and agree to the fertility treatments so that there is NO question that you've both agreed to have a child."

The spouse was present at the birth of the child and the couple jointly decided the name of the child. When the hospital officials asked for information on the parents, both participated in the discussions and the birth mother acknowledged that the spouse was the parent of the child. The child was given a hyphenated surname of the two women, with the spouse's name listed first.[2] The birth certificate for the child lists both as the parents of the child. (See Public Health Law § 4103 [3].)

would have applied recognition of marriage doctrine to same-sex marriages that are valid where performed].)

2. In Counihan v Bishop (111 AD3d 594 [2d Dept 2013]), the Court noted, as evidence of consent to parental status, that the spouse was listed as the second mother on the child's birth certificate and that the child's last name is the hyphenated last names of the spouse and the birth mother. A birth certificate is however only prima facie evidence of parentage, and does not, in and of itself, confer parental rights that must be recognized elsewhere. (Public Health Law § 4103; Matter of Sebastian, 25 Misc 3d 567 [Sur Ct, NY County 2009].)

After the birth of the child, citing marital trouble, the spouse left the household, in her words, to "not cause undue stress or potential other problems." The child only lived in the same household with the two women for one week before they established separate households. The action for divorce was commenced by the birth mother in December 2013, less than three months after the birth of the child. Before and after commencement, the birth mother would not permit her spouse to visit with the child. The spouse then filed the instant request for a variety of relief, including access to the child, maintenance, and attorney fees.

In resolving this dispute, there are two paths to be followed, each with intriguing twists and turns. The first runs through the state legislature and the various threads of the Domestic Relations Law and the Family Court Act. The second runs through the common law, with a lengthy stop over at the Court of Appeals opinion *Debra H. v Janice R.* (14 NY3d 576 [2010]), which confronts the issue of children of same-sex relationships albeit in a different, pre-Marriage Equality Act context. At the intersection of these two paths, one bright light illuminates both: New York's public policy strongly favors the legitimacy of children, and that "the presumption that a child born to a marriage is the legitimate child of both parents is one of the strongest and most persuasive known to the law." (*Laura WW. v Peter WW.*, 51 AD3d 211, 216 [3d Dept 2008] [internal quotation marks omitted]; *Matter of Fay*, 44 NY2d 137, 141 [1978] [there is an established legal presumption that every person is born legitimate]; *Matter of Findlay*, 253 NY 1, 7 [1930]; *Hynes v McDermott*, 91 NY 451, 459 [1883]; *Matter of Matthews*, 153 NY 443, 447 [1897]; *Murtagh v Murtagh*, 217 AD2d 538, 539 [2d Dept 1995]; *T.P. v B.P.*, 41 Misc 3d 1232[A], 2013 NY Slip Op 51963[U] [Sup Ct, Kings County 2013].) The presumption follows a common-law development:

> "At common law, parentage derived from two events, a child's birth to its 'mother,' and the mother's marriage to a man. Children born out of wedlock had only one legal parent, their birth mother. Recognizing the many advantages that flowed to children from having two parents, legislatures enacted filiation or paternity proceedings to confer legal parentage on nonmarital biological/genetic fathers, a status which carries support and other obligations." (*Matter of Sebastian*, 25 Misc 3d

567, 569 [Sur Ct, NY County 2009] [citation omitted].)[3]

The common-law presumption of "legitimacy" to children born in a marriage finds a corollary in both the Domestic Relations Law and the Family Court Act. Section 24 of the Domestic Relations Law is titled: "Effect of marriage on legitimacy of children." The statute provides that a child born to married parents "is the legitimate child of both birth parents." (Domestic Relations Law § 24 [1].)[4] Section 417 of the Family Court Act, demarcated "[c]hild of ceremonial marriage," provides:

"A child born of parents who at any time prior or subsequent to the birth of said child shall have entered into a ceremonial marriage shall be deemed the legitimate child of both parents for all purposes of this article regardless of the validity of such marriage."[5]

Both of these statutes, the former enacted in 1969, and the latter in 1962, predate the increasing availability of artificial insemination and the existence of legally-recognized same-sex unions and marriages. Both statutes were designed as tools to link reluctant married fathers to their offspring, regardless of whether the subject marriage was technically invalid under the strictures of New York law.[6] The statutes only have applicability in opposite-sex marriages as evidenced by the fact that the usual technique to confirm parentage is a genetic test of the putative father which establishes an irrefutable genetic link between the child and the father. (See Family Ct Act §§ 418, 516-a [b] [i];

---

**3.** The Iowa Supreme Court in *Gartner v Iowa Dept. of Pub. Health* (830 NW2d 335, 346 n 1, 347 [Iowa Sup Ct 2013]) classified states' codification of the "parentage presumption" into three classes: those using gendered terms (father/mother), those referring to "natural or biological" parents and those that could apply in a gender-neutral manner or to same-sex spouses. The proliferation of these "presumed parent[s]" statutes attests to the strong common-law basis for the presumption.

**4.** Domestic Relations Law § 24 (1) states that "[a] child heretofore or hereafter born of parents who prior or subsequent to the birth of such child shall have entered into a civil or religious marriage . . . is the legitimate child of both birth parents."

**5.** The two statutes use different terms to describe the marriage. The Domestic Relations Law refers to a "civil or religious marriage" and the Family Court Act refers to a "ceremonial marriage." This court could not find a statutory or case law distinction between the two terms.

**6.** Domestic Relations Law § 24's "purpose was to confer legitimate status on children whose parents have intermarried, notwithstanding the fact that such marriage may be void or voidable, or has been judicially declared to be void or has been annulled." (Revision Notes, NY CLS, Domestic Relations Law § 24.)

*Matter of Monroe County Dept. of Human Servs. v Joshua B.*, 25 Misc 3d 1238[A], 2009 NY Slip Op 52479[U] [Fam Ct, Monroe County 2009] [a GMT (genetic marker test) is the norm in a support proceeding where there is a question about who is the father].) The presumption of paternity under both the Family Court Act and the Domestic Relations Law may be rebutted by clear and convincing evidence excluding the husband as the father or otherwise tending to disprove legitimacy. (*Matter of Barbara S. v Michael I.*, 24 AD3d 451, 452 [2d Dept 2005]; *Matter of Walker v Covington*, 287 AD2d 572 [2d Dept 2001].)

Importantly, section 24 of the Domestic Relations Law, section 417 of the Family Court Act, and the common-law presumption regarding children born in marriages use the phrase "legitimacy" to describe the effect of marriage on a child, a phrase which in the 19th and early 20th centuries was an important facet of a child's rights to inherit property. (*Matter of Leslie*, 175 App Div 108 [1st Dept 1916]; *Matter of Meehan*, 150 App Div 681 [1st Dept 1912].) But, while the word "legitimate" may be somewhat archaic, the intent of these statutes, and the common-law presumption, is unambiguous: a child born in a marriage is the child of the couple. Strangely, despite the importance of the term "parent" in both the Family Court Act and the Domestic Relations Law, this term is not defined in either statute or under the common law. The lack of that definition has confounded New York courts for several decades, especially so since the advent of innovations in artificial insemination, and perhaps even more so since the enactment of New York's Marriage Equality Act. In the face of legislative silence, New York courts have struggled to define this important facet of modern life. As a starting point, under the common-law theory announced in *Matter of Findlay*, the phrase "parent" does not contain any gender-specific application. The Court of Appeals, even in 1930, used the phrase "parents" when describing the consequence of a child being born during a marriage. (*Matter of Findlay*, 253 NY at 10.) When *Matter of Findlay* is read broadly, the Court of Appeals' choice of the word "parents" suggests that the presumption for children born during a marriage is fulfilled when every child has two legitimate parents to provide for them, regardless of their respective sexes.

One other section of the Domestic Relations Law provides further guidance in deciding parental status in this case. Domestic Relations Law § 70 (a) permits only a "parent" to apply for custody of a child. The term is undefined in section 70 and, as the later course of this opinion indicates, the Court of Ap-

peals has refused to interpret that term in a sweeping manner, as *Matter of Findlay* might suggest. Four years ago, the Court of Appeals in *Debra H. v Janice R.* (14 NY3d 576 [2010]) cautioned not to overstep common-law prerogatives in dealing with any alteration of the definition of parenthood. The Court directed that "any change in the meaning of 'parent' under our law should come by way of legislative enactment rather than judicial revamping of precedent." (*Id.* at 596.) Furthermore, the Court reiterated that "parentage under New York law derives from biology or adoption." (*Id.* at 593; *accord Matter of White v Wilcox*, 109 AD3d 1145 [4th Dept 2013]; *see also Estrellita A. v Jennifer D.*, 40 Misc 3d 219, 222 [Fam Ct, Suffolk County 2013] [a live-in same-sex individual is not the parent of a child of artificial insemination because "(i)n the realm of same-sex parents, the Court of Appeals has consistently ruled that absent an adoption, the non-biological partner is not a parent under Domestic Relations Law § 70"].) What was left unsaid by the Court of Appeals in *Debra H. v Janice R.* is whether the marriage presumption—one of the most powerful in the legal lexicon—should be added to the list of circumstances in which "parentage" arises, even though the only putative "parents" recognized by New York's past jurisprudence under the statutes and the common law were members of opposite sexes.

While never defining the word "parent" in any pertinent statute, the legislature, more than 40 years ago, did anticipate the impact of artificial insemination on the determination of parenthood. Section 73 of the Domestic Relations Law, enacted in 1974, addresses the status of a parent when, as a result of artificial insemination by an anonymous donor, there would be no genetic link between the child and one of the two parents. The statute provides:

> "1. Any child born to a married woman by means of artificial insemination performed by persons duly authorized to practice medicine and with the consent in writing of the woman and her husband, shall be deemed the legitimate, birth child of the husband and his wife for all purposes.
>
> "2. The aforesaid written consent shall be executed and acknowledged by both the husband and wife and the physician who performs the technique shall

certify that he had rendered the service." (Domestic Relations Law § 73.)[7]

When all the statutory conditions are met, the statute operates to create an "irrebuttable presumption of paternity." (*Laura WW. v Peter WW.*, 51 AD3d 211, 214 [3d Dept 2008].) Regarding the purpose of Domestic Relations Law § 73, the court in *Laura WW. v Peter WW.* indicates it was designed

> "to give certainty to the legitimacy of those children conceived via [artificial insemination by donor] whose parents complied with all of the statutory prerequisites, rather than to create a means of absolving individuals of any responsibility toward a child, even if the proof could otherwise establish that the individual participated in and consented to the decision to create the child" (*id.* at 215-216; *see also K.B. v J.R.*, 26 Misc 3d 465 [Sup Ct, Kings County 2009] [Domestic Relations Law § 73 establishes parental rights to a child conceived via artificial insemination with the consent of both parties and such a child is considered the legitimate child of the parents at the time of insemination]).

Importantly, as the actual text indicates, the statute does not define "parent," and equally significant, it was not designed with the parents in mind: it was designed to benefit children born through artificial insemination. The legislative sponsor stated its purpose was "to make a child born in compliance with this proposed law legitimate for all purposes." The sponsor further noted that "[a]lthough present decisional law requires the husband to support a child conceived and born with his consent through artificial insemination, such a child is, in law, illegiti-

---

**7.** Domestic Relations Law § 73 serves an important policy function in New York. It is comparable to the written consent required in the Uniform Parentage Act, as articulated by another state court:

> "Nevertheless, it appears clear to us that the requirement of a writing serves two functions. First, the writing serves an evidentiary function. The existence of a document signed by the husband and the wife avoids disputes regarding whether consent was actually given. Second, the requirement serves a cautionary purpose. One who pauses to sign a document can be expected to give more thought to the consequences of consent than one who gives consent in a less formal setting. An additional purpose that may be served by the requirement of written consent is to protect from liability the medical personnel who conduct the procedure, but failure to advance that purpose could hardly be a ground for denying the husband's status as a natural parent." (*Lane v Lane*, 121 NM 414, 419, 912 P2d 290, 295 [1996].)

New York's added requirement—an acknowledged signature—gives even greater emphasis to the policy objectives discussed in *Lane v Lane*.

mate." (Assembly Introducer Mem in Support, L 1974, ch 303, 1974 NY Legis Ann at 175.) The "decisional law" referenced in the sponsor's memorandum reflects a series of opinions from trial courts attempting to apply the centuries-old presumption of intra-marital legitimacy to the new technology of artificial insemination. (*See e.g. Gursky v Gursky*, 39 Misc 2d 1083 [Sup Ct, Kings County 1963] [noting that artificial insemination, with or without the consent of the husband, made the child illegitimate]; *contra Matter of Anonymous*, 74 Misc 2d 99 [Sur Ct, Kings County 1973] [holding that a child born of consensual artificial insemination is a legitimate child entitled to the rights and privileges of a naturally conceived child of the same marriage and the father is a parent].) The court in *Matter of Anonymous* noted that New York had a strong policy in favor of legitimacy, and the legislature had then recently enacted section 24 of the Domestic Relations Law, which directed that a child born of a void or voidable marriage was nonetheless legitimate. The court added:

> "In the face of the liberal policy expressed by such a statute, it would seem absurd to hold illegitimate a child born during a valid marriage, of parents desiring but unable to conceive a child, and both consenting and agreeing to the impregnation of the mother by a carefully and medically selected anonymous donor." (*Id.* at 105.)[8]

In view of the different outcomes in these cases, the legislative intent behind Domestic Relations Law § 73, enacted shortly after *Matter of Anonymous*, is evident. Under these competing decisions, there was an unresolved legal question in New York as to whether a child, born to artificial insemination, was a legitimate child of the marriage. What these cases and the legislative history make clear is that the statute was designed not to benefit the adults in the marriage, but to benefit the child, born into

---

**8.** The court charted the legislative history of Domestic Relations Law § 73, noting:

> "Legislation [regarding artificial insemination] has been introduced in New York at a number of legislative sessions. It is of interest to observe that in 1948 the New York County Lawyers Association opposed a bill (S. Int. No. 745, Pt. No. 2042; N.Y. County Lawyers Assn. Memo., No. 114 of 1948) because the rights of the parties were obvious and legislation unnecessary. Following the *Gursky* decision, discussed *infra*, declaring AID children illegitimate, the association in 1964 recommended favorably a bill substantially similar to the one opposed earlier. (S. Int. No. 1882, Pt. No. 1922; N.Y. County L. Assn. Memo., No. 179 [1964].)" (*Matter of Anonymous*, 74 Misc 2d 99, 101 [Sur Ct, Kings County 1973].)

a marriage, by transforming what the common law considered an illegitimate child into a legitimate child.

█ The fact that the statute was designed to benefit the child is important in analyzing what happens if the consent required by the statute is not properly executed and acknowledged, which is what happened here. There is no evidence of an "acknowledgment" on the alleged consent here—neither signature is notarized and there is no evidence of any witness to either signature.[9] As the Court of Appeals has noted, in reviewing compliance with a statutory command for an acknowledged signature: "When there is no acknowledgment at all, it is evident that one of the purposes of the acknowledgment requirement—to impose a measure of deliberation and impress upon the signer the significance of the document—has not been fulfilled." (*Galetta v Galetta*, 21 NY3d 186, 196 [2013].) There is no evidence in the statutory history of Domestic Relations Law § 73 regarding the importance of the acknowledgment requirement on an artificial insemination by donor (AID) consent form. Faced with this lack of an acknowledgment, this court has to consider whether "substantial compliance"—the consent is signed by both spouses and the treating physician—could suffice to establish an irrefutable presumption. However, New York courts have required strict compliance with the statute. (*Laura WW. v Peter WW.*, 51 AD3d 211 [3d Dept 2008] [holding that husband could not be presumed to be the parent of a child born to his wife via AID under Domestic Relations Law § 73 because he did not consent in writing to the procedure]; *Anonymous v Anonymous*, 1991 WL 57753 [Sup Ct, NY County 1991] [a signed consent consistent with Domestic Relations Law § 73 creates an irrebuttable presumption of legitimacy].) New York follows other states that have insisted on full compliance with written consents in artificial insemination cases. (*See e.g. K.B. v N.B.*, 811 SW2d 634 [Tex Ct App 1991] [written consent required]; *In re Marriage of Witbeck-Wildhagen*, 281 Ill App 3d 502, 667 NE2d 122 [1996] [written consent required]; *S.C. v R.C.*, 164 Wis 2d 433, 476 NW2d 25 [1991] [table; text at 1991 WL 198136, 1991 Wisc App LEXIS 1132 (Ct App 1991)] [written consent strictly required]; *but see In re Baby Doe*, 291 SC 389, 392-393, 353 SE2d 877, 878-879 [1987] [holding that "even where husband's written consent is statutorily required, the failure to obtain written consent does not relieve husband of the responsibilities of parentage," and that a "husband's knowledge of and assistance in his wife's efforts to conceive through artificial insemi-

---

**9.** The physician overseeing the procedure signed the form, but there is no evidence that he witnessed the signatures of the two women.

nation constitute his consent to the procedure"]; *Lane v Lane*, 121 NM 414, 912 P2d 290 [1996] [holding that statutory compliance need only be substantial and not strictly construed, and thus, that a signed consent is not required].)[10] In this instance, the lack of an acknowledgment renders the signed consent form, although undisputedly executed by the birth mother and her spouse, ineffective under Domestic Relations Law § 73. It does not create an irrebuttable presumption that the non-biological spouse is a parent of the child.

Prior to 2010, even if a party did not strictly comply with the requirements of Domestic Relations Law § 73, New York courts held that the non-biological spouse may still be declared a parent of the AID child under the common-law marital presumption of legitimacy. (*Laura WW. v Peter WW.*, 51 AD3d 211 [3d Dept 2008] [holding that while husband could not be presumed to be the parent of a child born to his wife via AID under section 73 because he did not consent in writing to the procedure, he could still be declared the child's parent under the common law]; *Laura G. v Peter G.*, 15 Misc 3d 164, 169-170 [Sup Ct, Delaware County 2007] [explaining that "(n)either the statute itself nor the legislative memoranda in the Bill Jacket indicate any requirement that the procedures in Domestic Relations Law § 73 are the only way to establish the legitimacy of a child born by (AID)," and that "(t)he fact that strict compliance is not required is demonstrated by the fact that the statute does not have a provision for filing anywhere the written consent set forth in the statute, nor is there any penalty on anyone for failing to follow the statute," and concluding that "(t)he only conclusion that can be drawn . . . is that consent of the husband can still be proved in the same manner as it was before the statute was passed . . . by other clear and convincing evidence"].) In *Laura G. v Peter G.*, there was no signed consent, of any type, much less an acknowledged consent, and yet the court concluded that the husband's consent could be proved by other means. (*Id.* at 170.) The proof established that the husband not

---

**10.** In *Lane v Lane*, the New Mexico Court of Appeals referred to the Uniform Status of Children of Assisted Conception Act (approved by the National Conference of Commissioners on Uniform State Laws in 1988, but not adopted in New Mexico or New York). Under that model law, the husband of a woman, other than a surrogate mother, who bears a child through assisted conception, is deemed the father if he does not challenge his paternity in court within two years of learning of the child's birth. (*Lane v Lane*, 121 NM 414, 418 n 1, 912 P2d 290, 294 n 1 [1996]; Uniform Status of Children of Assisted Conception Act [1988] § 3.)

only knew of the procedure, but was a full participant. On appeal, while holding that the lack of written consent obviated any statutory finding of parentage, the Appellate Division, to give effect to "one of the strongest and most persuasive [presumptions] known to the law," concluded that in the cases in which artificial insemination of a married woman occurs, a rebuttable presumption of spousal consent, disproved only by clear and convincing evidence, exists. (*Laura WW. v Peter WW.*, 51 AD3d 211, 216-217 [3d Dept 2008].) This common-law presumption, even in artificial insemination cases, reaffirmed New York's public policy. It eliminated the possibility that parental status could be adversely affected by something as simple as failure of medical personnel to meet statutory procedural requirements. Especially because as one court noted, "medical personnel who conduct AID procedures are not always aware of statutory consent requirements." (*Id.* at 217; *Anonymous v Anonymous*, 1991 WL 57753 [Sup Ct, NY County 1991].)

Importantly, in all of these prior cases, the written consent requirement was used as the legal equivalent of a shield: in the absence of a properly executed consent, the husband argued that he could not be held accountable for support of his wife's child, created without his signed consent through AID. In short, the non-birth parent argued for a strict reading of the statutory requirement as a form of financial protection, shielding him from his obligation to support a child conceived by his wife without his knowledge and written approval. In this case, the roles are different: the birth mother seeks to use a strict reading of New York's consent requirements as a sword to cut off her spouse's rights as a parent to access to the child.

Extension of the "marital-parent" presumption in AID procedures finds further support in other jurisdictions. (*In re Baby Doe*, 291 SC 389, 391, 353 SE2d 877, 878 [1987] ["there was a rebuttable presumption that any child conceived by artificial insemination during the course of the marriage has been conceived with the consent of the husband"].) In *K.S. v G.S.* (182 NJ Super 102, 109, 440 A2d 64, 68 [1981]), a New Jersey court articulated the strong public policy underlying the common-law presumption: "Public policy considerations seeking to prevent children born as a result of AID procedures from becoming public charges or being bastardized require that a presumption of consent exist and that a strong burden be placed on one seeking to rebut the presumption." The New Jersey court explained that historically the question of legitimacy has

been in the context of naturally-induced birth. (*K.S. v G.S.*, 182 NJ Super at 107, 440 A2d at 67.) In such cases, "the central issue," the court noted, "is often an evidentiary question of access or nonaccess of the putative father at the time of conception." (*Id.*) But, in the case of artificial insemination, the court explained, "nonaccess, of course, becomes irrelevant." (*K.S. v G.S.*, 182 NJ Super at 108, 440 A2d at 68.) Instead, it stated, nonaccess "is replaced by the issue of consent in order to establish legitimacy." (*Id.*) The court further explained that

> "[s]ince consent, once it is disputed, is often far more difficult to prove to the same degree of certainty as physical access, it is only practical and reasonable to apply a rebuttable presumption criterion in determining threshold evidentiary questions as to the existence of consent at a certain point in time." (*K.S. v G.S.*, 182 NJ Super at 108-109, 440 A2d at 68; *see also People v Sorensen*, 68 Cal 2d 280, 437 P2d 495 [1968] [holding marital presumption applies in AID context]; *but see Jackson v Jackson*, 137 Ohio App 3d 782, 739 NE2d 1203 [2000] [holding that the burden is on the wife, the party seeking to prove consent, to prove it by a preponderance of the evidence].)

The legislative history and the review of the status of families in artificial insemination cases prior to enactment of section 73 of the Domestic Relations Law does highlight one important concept that impacts any decision in this case. The statute is designed to protect children by estopping any spouse, who consents in writing to the other spouse's artificial insemination, from subsequently disclaiming the child and declining support. The statute also protects non-birth spouses because it allows them—at their option—to disclaim such responsibility if they did not consent. But, the statute has no impact on the birthing spouse. As the birth mother, her "maternity" is unaffected. She cannot disclaim the child, conceived and born to her. She can use the statute to require a consenting spouse to provide care and support for the child. There is no language in the statute, or its history, suggesting that the birth mother can use a spouse's noncompliance with the statute for the purpose sought here: to strip the spouse of the rights of access to the child born through artificial insemination during the marriage.

Given the limited purposes of Domestic Relations Law § 73, and who can invoke its protections, another legislative initiative impacts this court's view. New York's Marriage Equality Act

extended to same-sex couples the recognition of their marriages. Section 3 of the act provides:

> "No government treatment or legal status, effect, right, benefit, privilege, protection or responsibility relating to marriage, whether deriving from statute, administrative or court rule, public policy, common law or any other source of law, shall differ based on the parties to the marriage being or having been of the same sex rather than a different sex. When necessary to implement the rights and responsibilities of spouses under the law, all gender-specific language or terms shall be construed in a gender-neutral manner in all such sources of law." (Domestic Relations Law § 10-a [2].)

Importantly, the statute specifically directs that no "common law" provisions relating to marriage "shall differ" because the married couple are the same sex. The implication of the MEA is unmistakable: wherever the words "husband" or "wife" exist in a statute or common law, the MEA requires the courts to read the terms as gender-nonspecific and extend the same rights to same-sex couples as exist for opposite-sex couples. The MEA eradicates any distinction between the sexes, but it does not address the definition of parenthood—it does not include a definition of "parent." Despite glimmers of instruction from a number of statutes, the lack of a statutory definition of parent in a post-MEA context requires this court to examine the Court of Appeals determination in *Debra H. v Janice R.* (14 NY3d 576 [2010]) to provide a definitive answer to the non-birthing spouse's parental rights in this case.

As noted earlier, the Court of Appeals, in *Debra H. v Janice R.*, articulated a strong preference that biology and adoption alone define a "parent" in an AID case. The Court held that equitable estoppel, in the form of proof of post-birth interaction with the child, did not give a spouse in a civil union any parental rights to a child born by artificial insemination. The decision in *Debra H. v Janice R.* followed the logic and holding of an earlier Court of Appeals decision in *Matter of Alison D. v Virginia M.* (77 NY2d 651 [1991]) which held that only a child's biological or adoptive parent has standing to seek visitation against the wishes of a fit custodial parent. (Domestic Relations Law § 70 [a].) *Debra H. v Janice R.* later reaffirmed that "*Alison D.*, in conjunction with second-parent adoption, creates a bright-line rule that promotes certainty in the wake of domestic breakups otherwise fraught with the risk of 'disruptive . . . battle[s]'

over parentage as a prelude to further potential combat over custody and visitation." (*Debra H. v Janice R.*, 14 NY3d at 593-594 [citation omitted].) The crux of the Court opinion was the distinction between a "parent" and a "biological stranger." (*Id.* at 593.) The Court majority frowned on the use of a common-law doctrine—equitable estoppel—to elevate a claim by a non-biological parent to the status of parenthood with full custodial and access rights. In reaching this conclusion, the court majority was obviously troubled by the potential entanglement of putative parents seeking to establish—or by a birth mother seeking to rebut—a sufficient factual relationship with the child to assume parental status. The Court was unwilling to stretch the definition of parent to include "categories of nonparents who have developed a relationship with a child or who have had prior relationships with a child's parents and who wish to continue visitation with the child." (*Id.* at 591.) The Court, in support of a bright-line test, refused to permit a cumbersome "fact-intensive inquiry" in an "equitable-estoppel hearing" that would be "contentious, costly, and lengthy" and leave "single biological . . . parents and their children in a limbo of doubt." (*Id.* at 595.) While commenting that the non-birthing spouse's custodial or visitation rights could only be extended by a second-parent adoption, the Court of Appeals nonetheless cast some light on the issue present in this case:

> "Significantly, 'the interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by' the United States Supreme Court. Courts must be sensible of 'the traditional presumption that a fit parent will act in the best interest of his or her child' and protect the parent's 'fundamental constitutional right to make decisions concerning the rearing of' that child. In our view, this fundamental right entitles biological and adoptive parents to refuse to allow a second-parent adoption, as Janice R. did, even if they have permitted or encouraged another adult to become a virtual parent of the child, as Debra H. insists was the case here." (*Id.* at 595-596 [citations and brackets omitted].)[11]

However, *Debra H. v Janice R.* does recognize, in a bright light,

---

**11.** The majority in *Debra H.* noted that the approach set forth in the concurring opinion of Judge Ciparik, who suggested invoking an implied "consent" to establish parental status, was impractical in child-parent cases. The majority stated:

through the principles of comity, that a child, born of artificial insemination to a couple in a civil union in Vermont, has a parent in each party to the civil union. The Court of Appeals majority quoted, with approval, the Vermont Supreme Court opinion in *Miller-Jenkins v Miller-Jenkins* (180 Vt 441, 912 A2d 951 [2006]), which held that a partner in a civil union was the parent of a child born during the civil union. The court in *Miller-Jenkins* (180 Vt at 465-466, 912 A2d at 970-971) cited the importance of the child being born during the civil union:

> "Many factors are present here that support a conclusion that [the partner with no biological connection to the child] is a parent, including, first and foremost, that [she and the child's biological mother] were in a valid legal union at the time of the child's birth. . . .
>
> "Because so many factors are present in this case that allow us to hold that the nonbiologically-related partner is the child's parent, we need not address which factors may be dispositive on the issue . . . . We do note that, in accordance with the common law, the couple's legal union at the time of the child's birth is extremely persuasive evidence of joint parentage."

The Vermont Supreme Court uses the phrases "first and foremost" and "extremely persuasive" to describe the couple's marriage as a factor in concluding that the spouse was a parent. It is a reflection of the strong presumption, displayed across the boundaries of many states, connecting marriage to parenthood. The Court of Appeals added its own gloss to the Vermont holding:

> "Indeed, entering into the civil union at a time when both partners know that one of them is pregnant by artificial insemination might well be viewed as presenting an even stronger case than *Miller-Jenkins*

"Judge Ciparick counters that the biological or adoptiveparent may simply withhold 'consent to the formation of [a] parental relationship between the [third party] and the child.' This is no answer since the parent cannot predict the inherently unpredictable—i.e., how a judge might someday rule on the question of whether or when there had been sufficient 'consent' such that, as a consequence, a 'parental relationship' had been 'formed.' " (*Id.* at 595 n 4 [citation and brackets omitted].)

Judge Ciparick agreed with the majority that "principles of comity require the recognition of Debra H.'s parentage of M.R.," but wrote separately "to set forth [her] view that *Matter of Alison D.* . . . should be overruled as outmoded and unworkable." (*Id.* at 606.)

to support the nonbiological partner's parentage. There is certainly no potential for misunderstanding, ignorance or deceit under such circumstance." (*Debra H. v Janice R.*, 14 NY3d at 599.)

In short, the Court of Appeals decision in *Debra H. v Janice R.* opens the door for New York to recognize a partner, in a civil union, as a parent of a child born by AID during the civil union. The only remaining question for this court is whether to recognize a spouse, in a marriage, as a presumed parent of a child born by AID during the marriage.

This court notes that other New York courts, before *Debra H. v Janice R.*, suggested that marriage should at least be considered on par with biology and adoption as a factor in determining parental status. (*Beth R. v Donna M.*, 19 Misc 3d 724 [Sup Ct, NY County 2008].) In *Beth R. v Donna M.*, the court examined a series of facts used in an attempt to impose an equitable estoppel on a party seeking to avoid financial responsibility. While the opinion primarily focused on whether New York should recognize a same-sex marriage from Canada—a once disputed, but now resolved issue in New York—the court, in seeking to establish paternity under a "best interests" and "equitable estoppel" framework, cited marriage as a factor in considering an estoppel, but not as determinative of parentage:

> "Marriage is 'a status founded on contract and established by law. It constitutes an institution involving the highest interests of society. It is regulated and controlled by law based upon principles of public policy affecting the welfare of the people of the State.' As a result of being married, plaintiff may be constrained to provide support for the defendant and defendant would be a recipient of a portion of plaintiff's estate. These factors significantly affect the children's welfare. Moreover, although people enter into marriages for many reasons, creating familial bonds is one of the most significant reasons, particularly for the benefit of their children. The parties here were clearly committed to becoming married, having traveled twice to Canada and having obtained two marriage licenses. It is noteworthy that the defendant voluntarily entered into the marriage after her first child was born. Furthermore, as plaintiff argues, the artificial insemination during the marriage resulting in the

birth of S.R. may require a finding that she is the legitimate child of both parents."[12] (*Id.* at 734-735 [citation omitted], citing Domestic Relations Law § 73; *State of New York ex rel. H. v P.*, 90 AD2d 434 [1st Dept 1982]; *Laura G. v Peter G.*, 15 Misc 3d 164 [Sup Ct, Delaware County 2007].)

Similarly, in *Matter of Sebastian* (25 Misc 3d 567, 573 [Sur Ct, NY County 2009]), the court considered an adoption of a child born by in vitro fertilization, and, to provide a final protection for the non-birthing married spouse, approved a second parent adoption. However, the court held that the non-biological spouse had a legally protected "child-parent relationship" through a marriage in the Netherlands, arguably making adoption unnecessary and impermissibly duplicative (*Id.*) The court also suggested that the Court of Appeals holding in *Matter of Alison D. v Virginia M.* (77 NY2d 651 [1991]) would not impair the spouse's claim because the "combination of *Martinez* [*v County of Monroe* (50 AD3d 189 [4th Dept 2008])] and the marital presumption together suggest their concern is likely unfounded, although not irrational." (*Matter of Sebastian*, 25 Misc 3d at 573 n 15.) In both of these cases, the lower courts did not resolve the question of the marriage (by itself) creating a presumed parental relationship for a child born of artificial insemination, but both courts seem to strongly suggest that conclusion. And, nothing in *Debra H. v Janice R.* suggests that these courts were incorrect in their postulating that marriage could suffice to create a parental presumption for the non-biological spouse.

In considering the impact of *Debra H. v Janice R.* on the current matter, several distinctions emerge between the two cases. The couple in *Debra H. v Janice R.* were in a civil union, not recognized in New York at the time. The Court in *Debra H. v Janice R.* was obviously unwilling to use the New York common-law doctrine of equitable estoppel to bootstrap a partner in a civil union into a marriage-equivalent, parental role, based on facts that occurred in New York. New York, at that time, did not recognize same-sex marriage. In addition, the equitable estoppel invoked in *Debra H. v Janice R.*, by the non-birth parent seeking access, involved factually disputed post-birth conduct. In this case, the non-biological spouse does not seek to enforce her rights under a post-birth estoppel. Here, the spouse seeks only

---

**12.** The Court of Appeals majority in *Debra H. v Janice R.* did not consider the question posed by Justice Drager in *Beth R. v Donna M.*—whether the marriage alone would endow parenthood on both spouses when consensual artificial insemination occurs.

to enforce a pre-birth form of estoppel, conditioned upon the undisputed fact that the couple was in a marriage both recognized in New York, and a marriage that is now legally permitted in New York. In short, the potential for a "contentious, costly, and lengthy" factual excursion into post-birth estoppel factors that convinced the Court of Appeals not to allow equitable estoppel to establish parental rights in *Debra H. v Janice R.* (14 NY3d at 595) does not exist in this case. The underlying valid marriage provides an undisputed basis for the assertion of parental rights.[13] The non-biological spouse here seeks to enforce her "bright-line" rights as a spouse in a marriage that produced a child.

In this court's view, the Court of Appeals would not mandate that compliance with Domestic Relations Law § 73 is the only means for a married, non-biological spouse to acquire parental status for a child born by artificial insemination of the other spouse. A contrary finding would make a child's parentage for his or her entire life depend on a notary public being present when the parties signed the consent. The absence of the notary alone would then deny the non-biological spouse one of the primary benefits of marriage. The Court of Appeals would be reluctant to cast such a disquieting eye on a claim for parenthood, founded on the centuries-old marital presumption of legitimacy. The presumption of parental status for children born into a marriage should not be so easily discarded because the married couple, who planned for the child and celebrated its arrival, then encounter marital troubles.

The clinching argument that suggests that the Court of Appeals would follow this well-trod path is found in *Debra H. v Janice R.*'s final conclusion. The Court, seemingly with all seven judges in concurrence, held that when a child is born in a recognized civil union in Vermont (where they would recognize the child as having two parents—the two individuals in the civil

---

**13.** Judge Graffeo's concurrence reiterates the need for a bright-line test, commenting that litigation should be avoided if the

> "parentage issue can readily be determined as a matter of law based on objective genetic proof or documentary evidence. Thus, protracted litigation on the standing of a party hoping to obtain custodial rights or visitation is avoided, which further promotes the settlement of these issues rather than the contentious litigation that is all too frequently harmful to children." (*Debra H. v Janice R.*, 14 NY3d at 603 [Graffeo, J., concurring].)

Judge Graffeo argued for an "objective" test to resolve these issues. The objective fact of the marriage would, in this case, erase the need for any such hearing.

union), New York would in comity accept that determination. Because the Marriage Equality Act has sanctioned same-sex marriage in New York, this state no longer needs to afford comity to other jurisdictions on resolving issues relating to parenthood in same-sex marriages. This marriage, although it occurred in Connecticut, is consistent with New York law, and in this court's view, the marriage of the parties differentiates this case from the Court of Appeals holding in *Debra H. v Janice R.*[14] At least one Court, following *Debra H. v Janice R.*, recognized that children, born by AID during a marriage originating in Connecticut, have parents in both spouses to the marriage. (*Counihan v Bishop*, 111 AD3d 594 [2d Dept 2013].) A second suggested (without deciding), that the unaltered status as a partner to the civil union may even vest certain legal rights with respect to any child that plaintiff may subsequently bear. (*Dickerson v Thompson*, 88 AD3d 121, 125 [3d Dept 2011], citing *Miller-Jenkins v Miller-Jenkins*, 180 Vt 441, 912 A2d 951 [2006].)

█ Here, applying *Laura WW. v Peter WW.* and the logic of cases from sister jurisdictions, the spouse is presumed, by virtue of the marriage and the rule in *Matter of Findlay*, to be a "parent" of the child. There is no dispute that the couple consented to be parents at the time of commencement of the AID procedure, albeit two years before the child was born. There is no evidence before the court to suggest that the birth mother, while embarking on the AID procedure two years before the birth, did not consent to her spouse's status as a parent. In fact, there is no evidence, prior to the onset of marital troubles between the couple, that the birth mother did not intend and consent to her spouse's status as a parent. As in *Laura WW. v Peter WW.*, the marital presumption of legitimacy created a presumption of consent in the AID context for this couple.

In response to the presumption created by marriage, the birth mother argues before this court that if a biological stranger were presumed to be a parent, the potential exists for a birth mother to have artificial insemination, without the permission of the married spouse, and then the unknowing, non-biological, marital partner could be "obligated for 21 years of support." The argument does not defeat the holding here. A consent,

---

**14.** In her concurrence, Judge Graffeo acknowledged, based on a civil union in Vermont, a "legal, parental relationship" was created between the non-biological partner and the child. (*Debra H. v Janice R.*, 14 NY3d at 606 [Graffeo, J., concurring].)

properly executed and acknowledged under Domestic Relations Law § 73, is irrefutable. The presumption that arises in this case—the presumption of a spouse's consent to artificial insemination—is not irrefutable. The marital consent presumed in this case may be rebutted by either spouse in the same-sex marriage. The birth mother could produce evidence that she never intended her spouse to be the parent of the AID child. The unknowing spouse would be faced with a presumption of consent to parenthood by virtue of the marriage and would have ample opportunity to rebut the presumption with evidence that the birth mother failed to obtain *any* consent prior to the conception. The unknowing, non-biological spouse would be required to overcome the presumption of consent, and prove lack of consent.

The birth mother also argues that this court cannot apply "equitable estoppel" to give the spouse parental rights. This court concurs that *Debra H. v Janice R.* dooms any claim based on equitable estoppel. But, the would-be parent in this case does not rely on equitable estoppel, which involves allegations of post-birth conduct by a putative non-biological parent as evidence of an intent to acquire parental rights. In *Debra H. v Janice R.* (14 NY3d at 589), the non-biological parent sought to introduce evidence that she had served as "a loving and caring parental figure during the first 2¹/₂ years of [the child's] life." This court concedes that such a determination by a trial court is fraught with complications, disputed facts which could easily lead to expensive and contentious hearings and appeals. In this case, the spouse does not make any claim that her post-birth parental involvement conduct creates any parental right. In fact, she offers no proof to support such a theory. She never suggests she is a "virtual parent," as the Court of Appeals described the would-be parent in *Debra H. v Janice R.* (14 NY3d at 596.) Instead, she argues that their marriage—a fact that was not a part of the Court of Appeals determination in *Debra H. v Janice R.*—provides the basis for the presumed consent to artificial insemination and triggers her parental rights.

Finally, the birth mother argues against applying the common-law presumption of "marital legitimacy," citing *Matter of Findlay*. She states that *Matter of Findlay* focused solely on the factual issue of a husband's access to his wife and therefore the common-law presumption only applies in the case of births naturally induced. She further argues that if sexual nonaccess to the wife is the means by which to defeat the common-law

presumption, then the presumption cannot be imposed in cases of AID because sexual intercourse never occurred. Some jurisdictions—New Mexico and Texas, for instance—have adopted this approach. (*See e.g. Lane v Lane*, 121 NM 414, 417, 912 P2d 290, 293 [1996] [holding that rebuttable presumption of legitimacy due to marriage was "indisputably rebutted by evidence of (h)usband's sterility and the artificial insemination"]; *K.B. v N.B.*, 811 SW2d 634, 636 [Tex Ct App 1991] ["(t)he parties agree that the husband is not the (AID) child's biological father and that the presumption of legitimacy has been conclusively rebutted"].) Nevertheless, New York, through the Third Department holding in *Laura WW. v Peter WW.*, rejected this approach that predicated a child's legitimacy on biological connection alone. Instead, New York focuses legitimacy of children on public policy grounds, and the firmly rooted belief that a child, born in a marriage, has two parents.

The only thing that distinguishes plaintiff here from the husband in *Laura WW. v Peter WW.* is the fact that the spouse and birth mother share the same sex. The Marriage Equality Act now eliminates that distinction. The Marriage Equality Act swept away many of the sex-based distinctions in New York's Domestic Relations Law in the spirit of individuals making their own choices in both entering and living a married life, free from unreasonable restraints. Section 3 of the MEA mandates that not only statutes, but the common law as well, are gender-neutral with respect to all the legal benefits, obligations, etc. arising from marriage. (Domestic Relations Law § 10-a [2].) In *Laura WW. v Peter WW.*, the Third Department predicated the husband's parental status on the fact of marriage, without regard to the husband's biological connection to the child or to his fertility in general. To impose the presumption of consent to AID for couples in a heterosexual marriage, but not for those in a same-sex one, when both are similarly situated, but for sexual orientation, would reverse the gender-neutral approach to New York's families canonized in the MEA. In *Laura WW. v Peter WW.*, the Third Department properly started New York down the path of presuming that the child of either partner in a married same-sex couple will be presumed to be the child of both, even though the child is not genetically linked to both parents. The Court of Appeals in *Debra H. v Janice R.* did not erect a roadblock in this path to greater equality in marital child-rearing. It simply held that unmarried couples seeking to use equitable estoppel alone to establish parental status could not

do so. This court will not stop that march to greater equality for all lawfully married couples. The pervasive and powerful common-law presumptions that link both spouses in a marriage to a child born of the marriage—the presumption of legitimacy within a marriage and the presumption of a spouse's consent to artificial insemination—apply to this couple. This court holds that the non-biological spouse is a parent of this child under the common law of New York as much as the birth mother.

With this determination, the court will require counsel to appear for an immediate conference to discuss the spouse's access to the child. The court notes that the child is very young, less than six months old. The spouse's access rights should be commensurate with the child's age and needs. The court declines, at this stage, to appoint an attorney for the child and will not do so until after a conference. With respect to maintenance, the court awards the non-biological spouse $750 a month for temporary maintenance, and further awards her $2,500 in legal fees to be paid within 30 days of submission of an order from this decision.