CLARK *v.* STATE

[No. 29, October Term, 1955.]

*Decided November 14, 1955.*

*Motion for rehearing filed November 30, 1955, denied December 2, 1955.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*William J. O'Donnell* for the appellant.

*David Kauffman, Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, Anselm Sodaro, State's Attorney for Baltimore City,* and *James W. Murphy, Assistant State's Attorney,* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

The appellant was convicted of bastardy—of being the father of a child conceived before, but born after,

the marriage of the mother to another. The trial was before the court without a jury. At the first hearing in February, 1954, objection was made to the mother's competency to testify as to nonaccess by her husband. The court held the matter *sub curia* and in August sent counsel an opinion in which he held that neither the husband nor the wife would be permitted to testify as to nonaccess of the husband. That opinion was not formally filed, the court in the meantime having decided that he would hear the case and take the protested evidence subject to exception. This he did in December and at the conclusion of the State's case, refused the appellant's motion for a directed verdict, kept in the evidence subject to exception and invited the appellant to proceed with his defense. The invitation was declined and the appellant rested. The court took the matter under advisement until March, 1955, when he announced his conclusion as follows: "The question involved is whether the so-called Lord Mansfield rule, which requires proof of non-access between husband and wife in order to overcome the presumption of legitimacy with reference to a child born during wedlock, is applicable where conception occurred *before* marriage. I have concluded that the rule is not applicable and that, even if it is, non-access has been satisfactorily established."

The appellant's main points are: (1) that in adulterine bastardy, whether the conception be ante-nuptial or post-nuptial, there is a presumption of legitimacy that the Lord Mansfield rule will not permit to be overcome by testimony of the mother that there was no access by her husband; and (2) that apart from the testimony of the mother, there was not enough evidence to permit a finding of nonaccess which had to be found before the mother could testify that she had had relations with the appellant and that he was the father of her child. The State urges that the Lord Mansfield rule should not be extended to cases of ante-nuptial concep-

tion and that even if it be held applicable here, there was other evidence of nonaccess which, together with the supporting evidence properly admitted after nonaccess was so shown, justified the verdict of guilty.

Two separate, although related, questions must be answered in resolving the conflict. First, does the general presumption that a child born when the mother is married is the child of the husband arise when the conception was ante-nuptial, and second, if so, what evidence is admissible and sufficient to rebut the presumption?

The cases, in England and in this country, agree uniformly that if conception and birth both occur during wedlock, there is a very strong presumption that the child is legitimate, but that the presumption may be rebutted by proper evidence. When a man marries a woman, knowing her to be pregnant and a child is born after the marriage, there is a similar presumption that he is the father. This, too, is the English rule and the American. In *The Law of Illegitimacy, Hooper,* Chap. 2, *Adulterine Bastardy,* p. 186, the author says of the English law: "A child conceived before but born after marriage is presumed to be legitimate if the husband at the time of the marriage knew, or had reason to suspect, that his wife (the mother of the child) was pregnant; on the principle that by marrying with knowledge of her condition he admits his paternity. * * * The presumption so arising can be rebutted by evidence which satisfies the judge or jury that the husband did not have sexual intercourse with the woman, who afterwards became his wife, at the period of conception * * *." See *Rex v. Luffe* (1807), 8 East 193, 198; *Gardner v. Gardner* (1877), 2 A. C. 723; *Halsbury's Laws of England* (1931 Ed.) *"Bastardy & Legitimation",* Sec. 769. In this country some of the early cases went so far as to make the presumption irrebuttable. *Bishop "Marriage, Divorce and Separation",* Vol. 1, Sec. 491, says in effect that if the man could not obtain a divorce for

fraud, there exists a presumption that the child is his. Both the presumption and the right to rebut it are recognized and applied as the law in the majority of the States. Some of the cases are collected in the notes below. In Note[1] are cited those in which both the presumption and the Lord Mansfield rule are applicable, and in Note[2] are cited those in which the presumption was held to arise but the rule was not applicable, either by statute or because it was not the law of that State. See also 7 *Am. Jur., Bastards,* Sec. 16; 10 C. J. S., *Bastardy,* Sec. 3 (b), p. 22; and 8 A. L. R. 428.

We turn to the character and strength of the evidence necessary to rebut the presumption. When both conception and birth occur after marriage, the Lord Mansfield rule will not permit either husband or wife to prove non-access at the critical dates, and neither they nor the paramour can give testimony that will bastardize the child until non-access be shown otherwise. If it is so

---

1 *Alabama: Carnegie v. Carnegie,* 73 So. 2d 556.
  *Georgia: Wright v. Hicks,* 12 Ga. 155, 56 Am. Dec. 451; *Mims v. State,* 157 S. E. 901.
  *Illinois: Zachmann v. Zachmann,* 66 N. E. 256; *Dill v. Patterson,* 62 N. E. 2d 249.
  *Iowa: Wallace v. Wallace,* 114 N. W. 527.
  *Maine: Hubert v. Cloutier,* 194 A. 303; *Monohan v. Monohan,* 46 A. 2d 706; *Mitchell v. Mitchell,* 11 A. 2d 898.
  *Massachusetts: Koffman v. Koffman,* 79 N. E. 780; *Sayles v. Sayles,* 80 N. E. 2d 21; *Phillips v. Allen,* 2 Allen 453.
  *Michigan: Rabeke v. Baer,* 73 N. W. 242, 249.
  *Nebraska: Schmidt v. State,* 194 N. W. 679; *Hudson v. Hudson,* 36 N. W. 2d 851.
  *New Hampshire: Parker v. Way,* 15 N. H. 45.
  *New Mexico: Yates v. Marcia,* 148 P. 493.
  *North Carolina: State v. Herman,* 35 N. C. 502; *Rhyne v. Hoffman,* 59 N. C. 335; *State v. Bowman,* 52 S. E. 2d 345.
  *Oregon: Westphall v. Westphall,* 197 P. 271.
  *Pennsylvania: Dennison v Page,* 72 Am. Dec. 644, 29 Pa. State 420; *Tioga County v. South Creek Township,* 75 Pa. 433.
  *South Carolina: Wilson v Babb,* 18 S. C. 59, 70.
  *Texas: Hicks v. State,* 263 S. W. 291; *Pinkard v. Pinkard,* 252 S. W. 265.
  *Virginia: Bowles v Bingham,* 2 Munford 442, 5 Am. Dec. 497; *Cornwall v. Cornwall,* 168 S. E. 439.
  *Wisconsin: State v. Flynn,* 193 N. W. 651.
2 *Arkansas: Jacobs v. Jacobs,* 225 S. W. 22.
  *California: Baker v. Baker,* 13 Cal. 87.
  *Connecticut: Grant v Stimpson,* 66 A. 166.
  *Kentucky: Gross v. Gross,* 260 S. W. 2d 655.
  *Mississippi: Ervin v. Bass,* 160 So. 568.
  *Missouri: Bower v. Graham,* 225 S. W. 978.
  *New York: Harding v. Harding,* 22 N. Y. S. 2d 810.
  *Ohio: Miller v. Anderson,* 3 N. E. 605; *Kawecki v. Kawecki,* 35 N. E. 2d 865.
  *Oklahoma: Stone v. Stone,* 145 P. 2d 212.
  *Tennessee: Jackson v. Thornton,* 179 S. W. 384.

shown, either husband or wife can testify as to any other relevant fact (even though it will bastardize the child), such as intercourse of the wife with another man and the identity of the real father. *Hale v. State*, 175 Md. 319. The rule is firmly established in Maryland. *Dayhoff v. State*, 206 Md. 25, 109 A. 2d 760; and its history, general and local, is discussed in *Hall v. State*, 176 Md. 488, 494.

In 1777, Lord Mansfield was inspired—apparently by some brooding omnipresence in the sky—to declare that "decency, morality and policy" required the law to be that a couple, after the birth of a child in wedlock, would not be heard to say that they have had no connection and their offspring is spurious. Both before 1777 and from then until 1903, it seems to have been accepted in England that the same character of evidence would be received to rebut the presumption of legitimacy in ante-nuptial conception as in post-nuptial conception. *Wigmore on Evidence*, Third Edition, Vol. 7, Sec. 2063. Cases of both kinds, before and after 1777, are cited in the Notes. It was expressly so held in *Anon. v. Anon.*, 23 Beav. 273. (Indeed, in *Goodright v. Moss*, 2 Cowpers 591, 98 English Reprints 1258, the case which established the rule, the very close question was whether the child had been born just before or just after the marriage.) In 1903 the *Poulett Peerage Case*, A. C. 395, was decided. In that case there had been no intercourse between the couple before marriage and the husband was in complete ignorance that his wife then was pregnant, a fact that soon after marriage she admitted frankly. After her death, he told of these facts in a proceeding to perpetuate testimony. In a suit to establish claim to title, after his death, it was held that his testimony and her statements were admissible. The *Poulett Peerage Case* was held to control in the cases of *McLean v. McLean* (1931), N. Z. L. R. 167, and *In Re Duckworth and Skinkle* (1924), 55 Ont. L. Rep. 272.

In the *McLean* case, the approval of the case would seem to have been *dictum*.

The *Poulett Peerage Case* cited no authority for its conclusion—it merely announced in certainties as Jovian as those of Lord Mansfield that the law was so. On the facts, there was held only that where there had been no intercourse and no knowledge of pregnancy before marriage, the husband could say so. It would seem that in such case, there arises no presumption of legitimacy to be protected, and the effect of the case should be correspondingly limited. *The Law of Illegitimacy, supra,* says at p. 188: "It would seem that no presumption of legitimacy arises in the absence of any evidence to show that the husband married with a knowledge that his wife was in the family way. (The reasons in support of this view are well expressed by *Geary: Marriage and Family Relations,* p. 159; cf. *Bishop: Marriage and Divorce,* sect. 187). There is certainly no presumption that the parties have misconducted themselves before marriage (*The Poulett Peerage,* 19 T. L. R. 646, *per* Lord Robertson)." The Delaware case of *Morris v. Morris,* 13 A. 2d 603, draws the distinction between situations where there is premarital intercourse or knowledge of pregnancy and where there is not; saying, that, where there is, the presumption arises and the Lord Mansfield rule, where it has found favor, is applied, but that where there is not, the Poulett rule should control because in such case, to raise a presumption would amount to consecrating "an utterly false supposition". The opinion suggests that the distinction underlies the established principle that a deceived husband may have a dissolution of the marriage for fraud. As we have noted, Bishop draws the same distinction. So, too, does the Ohio case of *Miller v. Anderson,* 3 N. E. 605 (*supra,* Note[2])—in which the Court distinguished an earlier case where it was not shown that the husband knew of the pregnancy at the time of the marriage. In *Baker v. Baker,* 13 Cal. 87 (*supra,* Note[2] ), the Court held that

where a man marries a woman with child, the law presumes the child is his but the presumption is based on the assumption that he knew of her situation and, if he did not, there is no presumption. Cf. *Behr v. Behr,* 181 Md. 422; and see 7 Md. Law Review 238.

The State would seem to overstate the proposition when it says that to apply the Lord Mansfield rule to the facts of the case before us would be to extend the rule. The *Poulett Peerage Case* did not refuse to extend the rule, rather it cut out an exception to the rule, on particular facts. This is the view taken by *The Law of Illegitimacy, supra,* Chap. 3, p. 205-217, particularly 215, where it is pointed out that the rule of the *Poulett* case is the fourth of six recognized exceptions to the rule. (The rule has since been abolished entirely in England by statute.) *Schatkin, Disputed Paternity Proceedings,* Third Edition (1953), p. 143, 144, likewise regards the holding of the *Poulett* case as one of a number of the exceptions to the rule.

We have found no case in the United States, in jurisdictions where the Lord Mansfield rule is in force, before 1903 or after, that has made the exception made in the *Poulett Peerage Case,* where there was either intercourse before marriage or marriage with full knowledge of pregnancy. In *Morris v. Morris, supra,* the Delaware Court said: "Where the Mansfield rule has found favor, it has been applied to those cases where a child is born in wedlock and conception took place prior to marriage * * *" and went on to say that neither spouse "* * * will be allowed to testify as to the non-access of the husband at the time of conception." In *Dayhoff v. State, supra,* the latest Maryland case on the subject, the Court, in applying the rule where conception and birth both occurred in wedlock, relied on *Hicks v. State* (Tex.), 263 S. W. 291 (1924); and *Schmidt v. State* (Neb.), 194 N. W. 679 (1923), and said this: "In *Hicks v. State, supra,* the defendant was convicted of deserting his child, born after marriage but begotten before

marriage. In affirming the conviction it was held that the law presumed that the husband was the father and that the lips of the parents, as a rule, are sealed on the question of sexual intercourse, so far as such testimony would go to assail the legitimacy of children." The opinion goes on to show that there were similar facts and the same holding in the *Schmidt* case. Cases in Maine, Massachusetts, New Hampshire, Pennsylvania, Virginia, North and South Carolina, Georgia and Alabama, as well as the mid-west and the far-west, have applied the rule as did the *Hicks* and *Schmidt* cases. If there is justification for both the presumption and the difficulty of rebutting it where the child is begotten and born in marriage, because of the furthering of social policy, there is much the same justification where there is ante-nuptial conception, knowledge of the pregnancy and subsequent marriage of the mother.

Nevertheless, we see no reason to decide whether the Lord Mansfield rule controls the case, on the facts before us, since we find that the State has met the burden of producing other sufficient evidence of nonaccess, entirely apart from and without consideration of the testimony of the mother, and the trial court made a separate and distinct finding of fact on that point. This is to say that the trial court could properly have found, as he did, from the evidence of other witnesses that the mother and the man who later became her husband, did not have intercourse at the time when, under the laws of nature, the baby must have been conceived, and that, therefore, the mother was competent to testify, (1) that she had had relations with the appellant, (2) that he was the father of her child, (3) as to what he said and did after he knew that she was pregnant, (4) as to her reason and her husband's for marrying, and as to other matters pertinent and relevant on the question of paternity.

Among the facts which led the lower court to the conclusion that the mother did not meet the man who later

became her husband until months after the baby had been conceived, are these. Patricia Ward, the prosecutrix, when she was fourteen and a half years old, met the appellant, Ronald Clark, in the fall of 1952. Thereafter they saw each other every day of every weekend. In February, 1953, Patricia became aware that she was pregnant. About May 1, 1953, Patricia, without pre-arrangement, stopped in at the home of a Mrs. Dingle, a friend of the family who had known her from birth, and where she frequently visited. A little later, a beau of Mrs. Dingle's daughter dropped in, bringing with him Joseph E. Skosnick. Mrs. Dingle introduced Patricia to Skosnick and to the other boy, her daughter helping her with the names. Patricia agreed to go on a blind date with Skosnick and the four young people went out together. Patricia's mother testified that she met Ronald Clark in 1953, when he came to take Patricia out. This was some five months before she met Joseph Skosnick. Ronald would come to their house and Patricia would go to his house and during the time he was calling on her daughter, no other boys did so, and she was not keeping company with other boys during that time. The mother says Patricia met Joseph Skosnick a month before he and her daughter were married on May 30, 1953. The child, an eight pound, five and a half ounce boy, was born November 4, 1953. Skosnick knew that Patricia was pregnant when he married her, for her mother told him so, and the marriage records were sealed in the Circuit Court for Baltimore County, in accordance with Code, 1951, Art. 62, Sec. 9, because Patricia was pregnant at the time of the application for the license. The mother said that the last time she saw Skosnick was a week after the marriage, because he left her daughter after a week and has not been seen since. The lower court said: "Even if the Lord Mansfield rule did apply to this case I find that the State has satisfactorily established non-access of Skosnick at or around the time the child must have been conceived according to the laws

of nature. * * * Testimony to establish the negative or to prove non-access must necessarily be very sparse and sketchy. * * * Mrs. Dingle testified that the first time she met Skosnick was around May 1, 1953, at which time she introduced him to Patricia. I find as a fact that Skosnick was introduced to Patricia at or about that time and that Patricia did not know him before that time. It would be quite weird to believe or undertake to find that they had sexual relations *before she was introduced to him,* at which time she was several months pregnant. There is no indication in the testimony that Patricia even knew or had heard of Skosnick before said introduction. * * * I think the admissible testimony on this point establishes, as satisfactorily as it is possible to do so, that there was no access between said parties prior to the introduction mentioned."

Once nonaccess had been established, the supporting evidence which then became admissible made it clear that the court well could have been convinced beyond a reasonable doubt that the appellant was the father of the child. Patricia and Skosnick decided to marry for different, unusual and presumption-destroying reasons. He believed that marriage and the child which was soon to be born would enable him to avoid Army service. Patricia did not want to give the child out for adoption and thought marriage would enable her to keep him. Skosnick left Patricia after they had lived together one week and has never had any contact with her or with the child since, and has never acknowledged or otherwise shown any interest in the child.

Patricia testified that she and the appellant had had sexual intercourse every day of every weekend from October, 1952 to February, 1953. When she found that she was pregnant, she told him and marriage was talked of. He told her and her father that he would marry her. Patricia and her mother went to Ronald's home and he said that he still wanted to marry, but his family was opposed. Finally, he told Patricia he would not

marry her and they and their respective mothers talked to a priest about placing the child for adoption. Patricia's mother testified to acts and statements that clearly permitted the inference that the appellant acknowledged the child to be his.

Early in the common law the presumption of legitimacy could be overcome only by evidence of what amounted to impossibility of access, but through the years the rule has been relaxed, so that now the presumption may be overcome by any proper evidence which convinces the judge or the jury that the husband did not have sexual intercourse with his wife, or the woman who afterwards became his wife, at the period of conception. The courts have varied as to what is proper evidence and as to the cogency of the evidence sufficient to rebut the presumption.

In England relaxation of the test began about 1800. A landmark was the case of *Morris v. Davies,* 5 Clark & Fin. 163. *In Re Findlay* (N. Y.), 170 N. E. 471, 473, discusses the history and relaxation of the test. Judge Cardozo said: "At times the cases seem to say that any possibility of access, no matter how violently improbable, would leave the presumption active as against neutralizing proof. * * * A formula so inexorable has ,yielded with the years to one more natural and supple. * * * the courts are generally agreed that countervailing evidence may shatter the presumption though the possibility of access is not susceptible of exclusion to the point of utter demonstration. Issue will not be bastardized as the outcome of a choice between nicely balanced probabilities. * * * They will not be held legitimate by a sacrifice of probabilities in a futile quest for certainty. Some of the books tell us that, to overcome the presumption, the evidence of nonaccess must be 'clear and convincing' * * * others that it must lead to a conclusion that is 'strong and irresistible' * * * others that it must be proof 'beyond all reasonable doubt' * * *. What is meant by these pronouncements,

however differently phrased, is this, and nothing more, that the presumption will not fail unless common sense and reason are outraged by a holding that it abides. * * * The presumption does not consecrate as truth the extravagantly improbable, which may be one, for ends juridical, with the indubitably false."

In *Hale v. State,* 175 Md. 319, *supra,* conception and birth took place during marriage. The Court held that "* * * when non-intercourse is shown to the trial court by clear, satisfactory, and convincing evidence, then the mother should be held competent to testify as to her relations with the accused, and to disclose the identity of the father of her child." Earlier, the opinion had paraphrased the words of Judge Cardozo in the *Findlay* case by saying of the Lord Mansfield rule that "* * * qualifications have been applied to the rule, so rationalizing it that, in this state and elsewhere, the presumption of legitimacy may be overcome when common sense and reason requires that departure." The evidence held sufficient in *Hale v. State, supra,* was that the mother of the prosecutrix, who lived about four doors from her daughter, testified that the daughter and her husband had been separated about three years. The daughter lived with her for a while and then went to live with a sister-in-law; during this time, she saw her daughter from time to time and the husband had not been around for three years. The sister-in-law testified that she had never seen the husband during that time, that he never came to visit the prosecutrix, who, during the critical period, went to live in the house of the accused. It was shown that the mother and the accused had recognized the child as their offspring and cared for it as such. The Court said: "It is rather difficult to perceive how more clear and convincing proof could be offered of the continued separation of this man and wife than here presented."

We think that the facts and the testimony in the *Hale* case make it authority in this case.

The English courts regarded the presumption of legitimacy where conception is ante-nuptial as less strong than where it occurs during marriage. Lord Blackburn summed up the English point of view when, in *Gardner v. Gardner* (1877), 2 A. C. 723, *supra,* he said: "I do not think that the presumption of parentage is nearly so strong in such a case as it would be or ought to be if the time when the child was begotten was after the parties were married and were husband and wife."

Some American cases take the same view. See *Wright v. Hicks,* 12 Ga. 155; *Wilson v. Babb,* 18 S. C. 59, 70, 71; *Jackson v. Thornton* (Tenn.), 179 S. W. 384; *In Re McDermott's Estate* (Neb.), 249 N. W. 555, 128 A. L. R. 725; 10 *C. J. S., Bastardy,* Sec. 6, p. 40. Other American cases have required the same degree of proof as where conception and birth both took place during marriage. In the instant case, the presumption of legitimacy, by reason of the marriage prior to birth, is greatly weakened because of the uncontradicted testimony that Patricia married only so she could keep her baby, that Skosnick married only for the purpose of avoiding Army service, that the marriage lasted but a week, and that he has never, in any way, given any sign that the child was his.

We find again, however, that it is unnecessary to decide the preferable standard of proof since, under the clear and convincing evidence test of *Hale v. State, supra,* the State met the necessary burden of rebutting the presumption of access by independent evidence and, in addition, produced evidence which permitted the trier of the facts to find beyond a reasonable doubt, measured by the stricter standard, that the appellant was the father of the child.

We have considered the other questions raised by the appellant and, as we see the case, think that the trial court committed no error to his prejudice.

*Judgment affirmed, with costs.*