REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2099

September Term, 2013

_____

MICHELLE L. CONOVER,

v.

BRITTANY D. CONOVER

_____

Zarnoch,
Wright,
Nazarian,

JJ.

_____

Opinion by Zarnoch, J.
Concurring opinion by Nazarian, J.

_____

Filed: August 26, 2015

In this same-sex divorce case, the parties are divided over one spouse's right of access to a child conceived by artificial insemination and born *before* they were married. On one side is the biological mother, appellee Brittany Conover; on the other is the non-biological, non-adoptive parent, Michelle Conover. The key issue presented is whether Michelle may invoke Maryland's paternity laws to confer upon her parental standing to seek custody or visitation without interfering with the constitutional rights of the natural parent, Brittany, and without satisfying the stringent standards of *Janice M. v. Margaret K.*, 404 Md. 661 (2008) and *Koshko v. Haining*, 398 Md. 404 (2007). The Circuit Court for Washington County denied custody and visitation and this appeal followed. For reasons set forth below, we conclude that under the circumstances presented here, absent a change in Maryland's statutory or common law, the non-biological, non-adoptive parent cannot prevail over the objection to custody and visitation by the biological mother. Therefore, we affirm.

## FACTS AND PROCEEDINGS

Michelle and Brittany began a relationship in July 2002, though Brittany acknowledges there were a number of "breaks." The parties discussed having a child together and agreed that Brittany would be artificially inseminated from an anonymous donor arranged through the Shady Grove Fertility Clinic. The child was conceived in 2009. In March of 2010, the District of Columbia, where the parties lived at the time, began to issue marriage licenses to same-sex couples. On April 4, 2010, Brittany gave birth to a son, Jaxon William Lee Eckel Conover. The birth certificate listed Brittany as Jaxon's

1

mother, but no one was identified as the "father." On September 28, 2010, the parties married in the District of Columbia.

In September 2011, the spouses separated. From the date of separation until July 15, 2012, Michelle visited Jaxon and had overnight and weekend access. At some point in July 2012, Brittany prevented Michelle from continuing to visit Jaxon. On February 8, 2013, Brittany, *pro se*, filed a Complaint for Absolute Divorce, which did not mention Jaxon. On February 19th, Michelle, *pro se*, answered and stated that she wanted visitation rights with respect to Jaxon. On March 14, 2013, Michelle, *pro se*, filed a Counter-Complaint for Absolute Divorce, in which she again requested only visitation rights.

On April 30, 2013, the parties appeared at a hearing scheduled to determine Michelle's standing to seek access to Jaxon. Michelle was now represented by counsel. Although the pleadings were not amended, Michelle's counsel at times appeared to argue for custody.[1] Brittany, appearing *pro se*, argued that Michelle did not have parental standing because she was not listed on the birth certificate as a parent of the child, and that as a third party, she could not assert visitation rights as Jaxon's parent. Michelle asserted that she met the paternity factors for a "father" set forth in Md. Code (1974, 2011 Repl.

---

[1] While recognizing that Michelle only sought visitation, the circuit court's opinion concluded that she did not have standing to contest either custody or visitation.

Vol.), Estates & Trusts ("ET"), § 1-208(b)[2] and thus, she had standing. At the hearing, Michelle's counsel said that there were "constitutional issues" that supported this interpretation of ET § 1-208(b), but did not elaborate. The court requested supplemental memoranda. Michelle filed a legal memorandum in which no constitutional contentions were made.[3] Brittany did not submit a memorandum.[4]

Circuit Judge Daniel P. Dwyer conducted an evidentiary hearing, taking testimony from both parents. Because Brittany appeared without counsel and lacked courtroom skills, Michelle testified generally without objection or cross-examination. Brittany had no such luck. Among the pieces of evidence elicited at the hearing were the following:

---

[2] Subsection (b) states:

A child born to parents who have not participated in a marriage ceremony with each other shall be considered to be the child of his father only if the father:
> (1) Has been judicially determined to be the father in an action brought under the statutes relating to paternity proceedings;
> (2) Has acknowledged himself, in writing, to be the father;
> (3) Has openly and notoriously recognized the child to be his child; or
> (4) Has subsequently married the mother and has acknowledged himself, orally or in writing, to be the father.

Subsection (a) provides: "A child born to parents who have not participated in a marriage ceremony with each other shall be considered to be the child of his mother."

[3] Michelle's memorandum also did not argue that § 1-208(b) had to be construed to apply to a woman in order to save its constitutionality.

[4] Counsel for Michelle also informed the court of the non-biological parent's plan to adopt Jaxon. The record does not disclose whether such an action was filed and, if so, its disposition.

3

1) Michelle helped choose an anonymous sperm donor with characteristics similar to her own;

2) Jaxon, at times, called Michelle "Dada" or "Daddy," although Brittany later objected to the practice;

3) On occasion, Brittany referred to Michelle as Jaxon's father;

4) A hand-written document, dated July 16, 2012, was introduced; it stated that both parties "verified" that they agreed to "joint custody" of Jaxon "[t]the exact terms of which to be determined at a later date."[5]

5) Michelle testified that the parties could not afford her adoption of Jaxon, but Brittany said that second party adoption was "never an option" because "I [knew] four months in to having a kid, that I did not want to be with her anymore because of a lot of abuse";

6) Brittany took on the more "female" role in the relationship, while Michelle took on the more "masculine" role; and

7) Michelle conceded that Brittany was a fit parent.

At the conclusion of the evidentiary portion of the proceeding, Michelle's counsel argued that parental standing existed under ET § 1-208(b). She also argued that Brittany was estopped to deny that Michelle was the child's father. Finally, she went on to assert:

> An alternative argument is that my client has standing for custody based on extra. . . extraordinary circumstances. And. . . and I'm not sure if you want me to go into that argument or not. Ah, but for a custody proceeding, a Court can consider custody to a third party or visitation to a third party if the Court finds that there are extraordinary circumstances. And I believe that this case screams extraordinary circumstances.[6]

---

[5] Michelle testified that the purpose of the document was to facilitate decisions if Jaxon were hospitalized. Brittany testified that she signed the document under duress.

[6] Michelle's supplemental memorandum also stated:

[I]n this case in the event that this Court determines that Michelle Conover is not the parent of Jaxon there still exists a viable third party cause of action

4

Subsequently, on July 4, 2013, the circuit court issued a written opinion. Judge Dwyer found that Michelle was not Jaxon's "father" and therefore, she could not establish parental standing under ET § 1-208(b). The court took note of the common law and statutory presumption that a child born during the marriage was presumed to be the child of both, but concluded that the presumption was not applicable here, where the child was conceived and born prior to the marriage. It declined to place importance on the fact that the parents could not be legally married in Washington, D.C. at the time of conception, but pointed out that the couple could have been married before Jaxon's birth. Relying on *Janice M. v. Margaret K.*, 404 Md. 661 (2008), the circuit court held that Michelle, as a "third party," had to show that Brittany was unfit or that exceptional circumstances existed to overcome the biological mother's constitutionally protected liberty interest in the care, custody, and control of her child.

The Court said that "[t]here has been no showing of exceptional circumstances present, based on the factors and the testimony at the hearing." According to the court's opinion:

> Jaxon had visitation and contact with Defendant from birth until July 15, 2012. Plaintiff testified during the hearing that she allowed for visitation for a period of time between the minor child and Defendant because she thought that was in the child's best interests, but that has since changed. This is the crux of the fundamental right of a parent, to determine who is, or is not, in the child's best interest to be around.

---

for custody based on exceptional circumstances where Michelle Conover's *de facto* status as the parent of Jaxon may in fact be considered by this Court. Therefore, . . . the issue of custody of Jaxon is ripe and appropriately before this Court.

In addition, the court said:

> In this case, Jaxon is very young, and although there may be a bond between Defendant and Jaxon, as she was a *de facto* parent, that alone is not sufficient to establish exceptional circumstances. The child is still in a stable environment, with a fit parent, with almost a year of no contact with Defendant, and although an active participant in his life when he was born, after analyzing the factors, this Court finds that there is not enough evidence to establish sufficient exceptional circumstances in this case. Therefore, despite the best interest arguments made by the Defendant in favor of her having visitation of the minor child, there has been no finding of unfitness or exceptional circumstances which would allow the Court to overcome Plaintiff's liberty interest in raising her child.

Of Michelle's reliance on the paternity statute, Judge Dwyer said:

> Although, it is certainly a creative argument, the statute is intended for children to claim parentage and rights to property after a parent has deceased, not for the parent to claim the child under it. Moreover, this Court finds that even under its broadest interpretation, the statute's application was intended by the legislature to be applied in instances of child support, not to establish standing for visitation and custody of a child. *See* Md. Code Ann., Fam. Law § 5-1005(a). The Defendant argues that although not a male, she has sufficiently satisfied three of the four criteria under § 1-208(b) to qualify as the minor child's father. § 1-208(b) specifically pertains to the parentage of an illegitimate child claiming his or her "father", which the Defendant is this case is not. During the hearing the parties testified to the fact that the Defendant is in fact a female, had not adopted the child, and in no way was related to the child, thus not sufficiently establishing that she could be the "father" of the child.

The court added: "While there may have been an argument related to equal protection both under the U.S. Constitution and Maryland's Declaration of Rights for same sex parents,

6

neither party argued that during oral argument nor in their supplemental briefs." After the

divorce was granted on October 21, 2013, Michelle appealed.[7]

## QUESTIONS PRESENTED

We rephrase the questions presented as follows:[8]

1) Did the court err in finding that Michelle did not have parental standing under ET § 1-208?

2) Did the court err in denying Michelle visitation or custody?

We answer these questions in the negative and affirm the decision of the circuit court.

---

[7] The Free State Legal Project, the American Civil Liberties Union of Maryland, Equality Maryland, and the Public Justice Center have joined in an Amicus Curiae brief urging reversal of the circuit court decision.

[8] Michelle's brief presents the following questions:

1) Are Maryland's statutes that set forth criteria to determine parentage unconstitutional because they discriminate against women on the basis of sex?

2) Are Maryland's statutes that set forth criteria to determine parentage unconstitutional because they discriminate against homosexuals?

3) Did the Trial Court err as a matter of law when it declined to extend to Appellant, a female, the same rights afforded to men, as fathers, under Maryland's parentage statutes?

4) Did the Trial Court err when it required a determination of parentage before it would consider either a third party custody claim or other custody claim by Appellant?

5) Did the Trial Court err when it refused to allow Appellant to have a trial or hearing and present evidence in support of a third party claim for custody or visitation of the minor child based upon the best interests of the child?

**DISCUSSION**

## I. Did the court err in finding that Michelle Conover was not the parent of Jaxon?

In child access disputes, "when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion." *In re Yve S.*, 373 Md. 551, 586 (2003). Whether exceptional circumstances exist to allow a third party to have access to a child over the objection of the biological mother cannot be determined as a matter of law, but must be gauged on the facts. *Monroe v. Monroe*, 329 Md. 758, 777 (1993). Legal questions, such as the interpretation and constitutionality of statutes, are considered *de novo*. *Schisler v. State*, 394 Md. 519, 535 (2006). Here, Michelle challenges the court's interpretation of ET § 1-208(b), as well as the constitutionality of this and other paternity statutes.

## A. Constitutional Considerations I – Preservation

Michelle devotes nearly half of her brief to attacking the constitutionality of Maryland's paternity and child legitimacy statutes as discriminating against women and homosexuals. However, these issues were neither raised nor decided below. Even if they were sufficiently raised, Brittany, appearing *pro se* and at a loss at how to litigate, could not have addressed such questions. Nor has the Attorney General weighed in on these profound and complex issues. As noted by then-Court of Special Appeals Chief Judge Robert Murphy in *Vuitch v. State*, 10 Md. App. 389, 397 (1970), "it would be foolhardy in the extreme to undertake the resolution of such complex constitutional questions" on such a record. Therefore, we turn to the remaining issues in the case.

8

**B. Constitutional Considerations II – The Rights of Biological and Adoptive Parents**

While Amici argue, on the basis of *In re Roberto d.B.*, 399 Md. 267 (2007), that to be consistent with the Equal Rights Amendment, Article 46 of the Maryland Declaration of Rights, ET § 1-208(b) must be read to include women, a more basic inquiry is whether this construction of the statute would be consistent with a biological mother's liberty interest under the 14th Amendment to the U.S. Constitution and Article 24 of the Declaration of Rights. Michelle and Amici contend that if it is in the child's best interests, she wins access rights to Jaxon merely upon acknowledging herself in writing to be the parent, <u>or</u> openly and notoriously recognizing Jaxon as her child <u>or</u> because after the child's birth, she married Brittany and has acknowledged herself, orally and in writing, to be the parent. Under Maryland case law, none of the factors either individually or collectively would amount to "exceptional circumstances" justifying child access.

In *Janice M. v. Margaret K*, 404 Md. 661 (2008), the Court of Appeals declined to recognize the *de facto* parent doctrine because it would "short-circuit[] the requirement to show unfitness or exceptional circumstances." *Id.* at 685. The Court went on to emphasize:

> Even were we to recognize some form of *de facto* parenthood, the real question in the case *sub judice* will remain, whether, in a custody or visitation dispute, a third party, non-biological, non-adoptive parent, who satisfies the test necessary to show de facto parenthood should be treated differently from other third parties. We have not been persuaded that they should be. In other words, where visitation or custody is sought over the objection of the parent, before the best interest of the child test comes into play, the *de facto* parent must establish that the legal parent is either unfit or that exceptional circumstances exist.

*Id.* This strict standard is grounded in the due process liberty interest of the biological or adoptive parent. *Id.* at 677-78; *see also Koshko v. Haining*, 398 Md. 404, 441 (2007).

9

The same-sex parents in *Janice M* were not married and could not have been legally married in Maryland at the time. Here, Michelle and Brittany were legally married. Logic suggests that should make some difference.[9] However, Maryland case law indicates otherwise. *Janice M* indicates that its stringent requirements for parental status applied to a step-parent of a child born before the marriage. 404 Md. at 686. As a result, this Court noted that *Evans v. Evans*, 302 Md. 334 (1985) had been overruled. That case had held that visitation rights could be awarded to a non-adoptive step-mother of a minor child if in the latter's best interests. *In re Victoria C.*, 208 Md. App. 87, 99 n. 1 (2012) *aff'd in part,*

---

[9] In *Wendy G-M. v. Erin G-M.*, 985 N.Y.S.2d 845, 847 (N.Y. Sup. Ct. 2014), a case decided after New York adopted its Marriage Equality Act (MEA), a Supreme Court judge held that marriage should be considered on a par with biology and adoption as a factor in determining parental status in a child access dispute between same-sex spouses. *Id.* at 857. The court relied on 1) New York's common law presumption that when a child is born during the marriage, even if conceived by artificial insemination, he or she is the child of both parents and 2) the enactment of the MEA, to permit the non-biological parent to seek access to the child. *Id.* at 848, 860. Noting that New York courts had previously refused to recognize "virtual parenthood," *id.* at 860-61, the *Wendy G-M.* court held that that "roadblock" applied only to unmarried couples, not to same sex parents of a child born during the marriage. *Id.* at 861. While Maryland statutory and common law recognizes the principle/presumption regarding children born or conceived during a marriage, *see* ET § 1-206 and Md. Code (1984, 2012 Repl. Vol.), Family Law Article ("FL") § 5-1027(c); *Clark v. State*, 208 Md. 316 (1955), most jurisdictions do not extend the presumption to children born before the marriage. *See* Annot.: Presumption of Legitimacy, or of Paternity of Child Conceived or Born Before Marriage, 57 ALR 2d 729 (1958) at § 6; 41 Am Jur 2d Illegitimate Children at § 19 (2005). Illinois courts which apply this presumption describe it as "not strong." *Racky v. Racky*, 284 N.E.2d 425, 427 (Ill. App. 1972). The Court of Appeals opinion in *Monroe v. Monroe* is ambivalent on the question. *Contrast* 329 Md. at 778-79 (A man who was not married to the mother at the time of child's conception or birth is not presumed the father), *with id.* at 772 (Respondent "is in a position comparable to that of a presumptive father"). We express no view on whether extension of the common law is appropriate here and whether such extension would be consistent with the constitutional rights of a biological parent.

*vacated in part,* 437 Md. 567 (2014).  In addition, the Court of Appeals, in *Victoria C.*, identified who is a "third party" for purposes of a person seeking child access over the objection of a natural parent.  The Court said that "[a] person . . . seeking visitation who is not a biological or adoptive parent is a third party." 437 Md. at 591.[10]  These authorities would appear to indicate that marriage in and of itself alone does not confer parental status to contest child access opposed by a biological parent.

Michelle and Amici rely primarily on *Monroe v. Monroe, supra*, which was decided before *Janice M* and *Koshko*.  That case involved a custody dispute between the biological mother and the child's stepfather.  The Court of Appeals described the critical facts:

> In the present case, that the respondent is not Beth's father is only fortuitous. Prior to her birth, having been told, and after investigation, having come to believe, that she was his child, he allowed his name to be placed on the birth certificate as her father and proceeded to act as her father.  He was present in the delivery room when she was born and he lived with her and her mother, with the exception of periods of separation, both before and after he married her mother, from the time of Beth's birth.  He has, in short, treated the child as if she were his biological child from the time of her birth up to, and beyond, the determination that he is not. From the time of her birth, until recently, and then only for a short time, Beth lived in Baltimore County.  For much of that time, she lived with the petitioner and the respondent. Even when she was placed in the physical custody of the petitioner, the respondent, pursuant to the separation agreement, exercised liberal visitation.  Indeed, he had joint custody with the petitioner.  The evidence at the hearing further tended to prove that the child viewed the respondent as her father; she is bonded to him, and he to her.  According to Dr. Leon Rosenberg, the respondent is Beth's psychological father.

---

[10] The brief of Amici calls this statement in *Victoria C.* an "oversimplification" and urges us to "reconsider" *Janice M*.  These contentions are better addressed to the Court of Appeals, particularly since *Janice M.* overruled this Court's recognition of the *de facto* parent doctrine.  404 Md. at 685.

329 Md. at 776-77. The Court also noted that the stepfather met three of the four tests for acknowledging paternity under ET § 1-208(b). *Id.* at 769.[11] However, this did not remove all obstacles to the stepfather's desire for custody. The *Monroe* Court said that the circuit court still had "to determine whether there exists sufficient exceptional circumstances to rebut the presumption that custody should be awarded to the biological parent." *Id.* at 774.[12] *Janice M.* emphasized this portion of *Monroe*: "On appeal, this Court reiterated the well-settled proposition that, as a third party, Beth's putative father was entitled to custody only if exceptional circumstances existed to rebut the presumption that custody belonged with the fit biological parent." 404 Md. at 690.

The implications of this language for this case are obvious. A non-biological, non-adoptive spouse who meets one, two or even three tests under ET § 1-208(b) is still a "third party" for child access purposes. Under *Janice M.*, he or she is not a "legal parent" as Amici contend. He or she must still show exceptional circumstances to obtain access to a child over the objection of a fit biological parent and to overcome the natural parent's due process rights. Moreover, there is no gender discrimination or sexual orientation discrimination because all non-biological, non-adoptive parents face the same hurdle, no matter what sex or sexual orientation they are.

---

[11] In a footnote, the Court said: "Because, in this case, the respondent complied with three of the four methods prescribed, whether the disjunctive factors are of co-equal importance in establishing the man's paternity of a child is a matter that we need not and, therefore, do not address." *Id.* at 769 n.6.

[12] Without finally resolving the matter, the Court suggested that exceptional circumstances did exist. 329 Md. at 777.

**C. Impact of Prohibitions on Same-Sex Marriage**

Michelle also contends that the circuit court erred in not giving "due weight" to the fact that Michelle and Brittany were not legally allowed to be married in either Maryland or the District of Columbia when Jaxon was conceived. Thus, she argues, she was denied the benefit of the presumption that a child born or conceived during a marriage is presumed to be the legitimate child of both spouses. ET § 1-206(a)

There are at least three problems with this argument. First, there is no evidence in the record as to why the couple chose 2009 for the conception of Jaxon. Second, although the change in D.C.'s marriage law did not take effect until the following year, at least three states (Connecticut, Iowa, and Massachusetts) permitted same-sex marriage in 2009. *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2611 (2015) at Appendix B. Finally, the presumption Michelle sought is not lost when the child is conceived before the marriage, as long as the child is born during wedlock. *Clark v. State*, 208 Md. 316, 320 (1955) ("When a man marries a woman, knowing her to be pregnant and a child is born after the marriage, there is a similar presumption that he is the father."); 41 Am Jur 2d, *supra* at § 18.

The couple could have married before Jaxon was born, but did not. The circuit court did not err in failing to accord weight to the prohibition on same-sex marriage that once existed.

**D. Best Interest of the Child**

Appellant urges us to find error because the circuit court failed to consider the best interest of the child when determining parental standing. However, Maryland case law is

very clear on this point: "[W]here visitation or custody is sought over the objection of the parent, *before* the best interest of the child test comes into play, the *de facto* parent must establish that the legal parent is either unfit or that exceptional circumstances exist." *Janice M.*, 404 Md. at 685 (Emphasis added).

**E. Equitable Estoppel/Parenthood by Estoppel**

Michelle argues that Brittany is "barred by the doctrine of equitable estoppel from claiming that Appellant is not the parent of the minor child." This contention seems more akin to the "parenthood by estoppel" doctrine, rather than "equitable estoppel." Without expressly adopting parenthood by estoppel, the Court of Appeals in *Janice M.* described the difference from equitable estoppel:

> Equitable estoppel in the context of child support proceedings has been applied in some states to prevent a party from refusing to pay child support after he or she has held himself or herself out to be the parent of a child. . . . The concept is not, however, the equivalent of "parenthood by estoppel." "Parenthood by estoppel" prevents one legal parent from denying a party visitation or custody rights where the legal parent previously has taken affirmative steps or actions to treat that party as the actual parent of his or her child.

404 Md. at 692 n. 12.

There are only a handful of cases around the country that even mention parenthood by estoppel and two of these decline to adopt the doctrine out of concern for its impact on the rights of fit biological parents. *See Crouse v. Crouse*, 552 N.W.2d 413, 417 (S.D. 1996) ("If we adopted this expansive rationale, almost any stepparent could acquire parenthood by estoppel."); and *A.H. v. M.P.*, 857 N.E.2d 1061, 1073 (Mass. 2006) ("[T]he parent by estoppel principle is a most dramatic intrusion into the rights of fit parents to care for their

14

child as they see fit.").[13]  Because Michelle relied only on traditional equitable estoppel

principles, there is no need for us to address her claim as one for parenthood by estoppel.

In *Knill v. Knill*, 306 Md. 527, 534-35 (1986), the Court of Appeals summarized the

elements of equitable estoppel in a child support case:

> [E]quitable estoppel requires that the party claiming the benefit of the
> estoppel must have been misled to his injury and changed his position for the
> worse, having believed and relied on the representations of the party sought
> to be estopped. . . .  Although wrongful or unconscionable conduct is
> generally an element of estoppel, an estoppel may arise even where there is
> no intent to mislead, if the actions of one party cause a prejudicial change in
> the conduct of the other. . . . Of course, the party who relies on an estoppel
> has the burden of proving the facts that create it.

Typically, the detriment element is a financial one.  *Id.* at 537.

Michelle asserts in her brief that she has met her burden of proving equitable

estoppel:

> Appellee testified that she voluntarily represented that Appellant was the
> parent of Jaxon and indeed represented this fact to Jaxon and to the public
> both during the marriage and during the separation.  Indeed, while no father
> is indicated on the child's birth certificate he bears the same middle name
> "Lee" and last name "Conover" of Appellant and, according to the testimony
> of Appellee, this was entirely her doing as Appellant was not afforded the
> opportunity to handle the birth certificate.  Appellant testified that she relied
> upon this representation and indeed Appellee testified that she was aware that
> Appellant relied upon this representation and believed it.  Third and finally,
> Appellant relied upon the voluntary representation of Appellee to her
> detriment.  Appellant testified that based upon her reliance upon such
> representations she did not believe that it was necessary for her to

---

[13] The Massachusetts Court observed that the American Law Institute, which recognized the doctrine, said its use is most appropriate where "adoption is not legally available or possible."  857 N.E. 2d at 1073; *see* American Law Institute, Principle of the Law of Family Dissolution: Analysis and Recommendations, 32.03 (2003).  In that case, as here, the non-biological parent could have sought to adopt the child.

immediately pursue adoption or custody of Jaxon after he was born and, indeed, because money was not readily available she believed that the money was better spent to provide for Jaxon.[14]

In our view, these assertions do not establish that Michelle was misled to her detriment. It was true that Michelle was a parent in the family and representing this to the world would not be misleading. If, at times, Brittany represented that Michelle was the father, no one could reasonably believe that she was somehow the biological father of the child. Nor, it is surprising that an unmarried mother would "handle" the birth certificate or that the document at that time would require gender designations for the parents. Finally, Michelle had ample time – years, in fact – to pursue the adoption of Jaxon. In short, we find no error in the circuit court's rejection of the Appellant's claim of equitable estoppel.

For all of these reasons, we affirm the circuit court's decision that absent "exceptional circumstances," Michelle did not have parental standing to challenge the denial of visitation or custody.

**II. Did the court err in denying Michelle visitation or custody?**

---

[14] Appellant does not appear to base her estoppel argument on evidence of *de facto* parenthood, the fact that the parents married, or the ambiguous handwritten "joint custody" agreement. Maryland cases and relevant out-of-state authority would not support estoppel on such basis. *See Knill v. Knill, supra,* 306 Md. at 536; *see also Miller v. Miller*, 478 A.2d 351, 358 (1984) ("[N]o court has ever applied equitable estoppel to force a husband to support the children of his divorced spouse merely because he developed a close relationship with the children, nurtured them into a family unit with himself as the father, and had the children call him 'daddy.'"); *C.T.D. v. N.E.E.*, 653 A.2d 28, 31 (Pa. Super 1995) (Marriage and establishment of a household did not create parenthood by estoppel); and *A.H. v. M.P.*, 857 N.E.2d at 1074 (Private agreement alone does not suffice to create parental rights in one who is not the child's biological or adoptive parent.).

In the circuit court, Michelle argued that even if she were considered a third party, exceptional circumstances existed for her to assert a claim for visitation or custody. *See* pages 4-5 *supra.* In this Court, she does not appear to reiterate that argument. Rather, she contends that the circuit court erred in reaching the issue of exceptional circumstances, which she reserved for consideration at a subsequent evidentiary hearing. In addition, she argues that the denial of the additional hearing violated her state constitutional right to due process. We disagree.

Appellant had an evidentiary hearing, where she introduced evidence of "exceptional circumstances" – evidence her counsel said "screamed extraordinary circumstances." Her lawyer characterized this contention as "[a]n alternative argument" for Michelle's standing – and determination of standing was the purpose of the hearing. In her supplemental memorandum, appellant said that she had a "viable cause of action for custody based on exceptional circumstances" and that "the issue of custody of Jaxon is ripe and appropriately before this Court." In light of such declarations, if not invitations, the circuit court could not be faulted for believing it should resolve the question.

Secondly, Michelle developed a fairly extensive record at the April 30th hearing – without much in the way of a challenge by a *pro se* opponent – and enough for the circuit judge to characterize Michelle as a "*de facto* parent." It is hard to imagine what new relevant evidence might be considered at an additional hearing and Appellant has not pointed to anything critical that was missed.[15]

---

[15] This was not a case where the child was old enough to testify or to communicate to an expert.

Finally, there were six months between the April 30th hearing and the grant of divorce – three months between Judge Dwyer's ruling and the issuance of the divorce decree. Michelle could have requested an additional evidentiary hearing or reconsideration of the interlocutory ruling on standing.

For these reasons, we conclude that the circuit court did not err in deciding the issue of exceptional circumstances on the basis of the evidence introduced at the April 30th hearing. Because we have not been asked by Appellant, we will not address the correctness of the circuit court's conclusion that exceptional circumstances did not exist to confer access rights on Michelle.

In conclusion, it must be said that this is a sad case; nor can Michelle's desire for access to Jaxon be questioned. However, the present state of Maryland case law leaves us no choice. The interplay between the State's paternity statutes and the marriage, divorce, and child access rights of same sex couples is aptly characterized as "uncharted Maryland waters in an area where the Legislature is better suited to consider the competing legal and societal values. . ." *In re Roberto d.B.*, *supra*, 399 Md. at 312-13 (dissenting opinion of Judges Harrell and Raker).[16]

> **JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY, MARYLAND AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

[16] At the 2015 session of the General Assembly, four bills were introduced that would have authorized *de facto* parenthood. *See* SB 402; SB 550; HB 577; and HB 1083. The last bill had forty sponsors. Although none of these measures were enacted, they demonstrate a genuine legislative concern that *Janice M.* should not be the final word on *de facto* parenthood.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2099

September Term, 2013

_____

MICHELLE L. CONOVER

v.

BRITTANY D. CONOVER

_____

Zarnoch,
Wright,
Nazarian,

JJ.

_____

Concurring Opinion by Nazarian, J.

_____

Filed: August 26, 2015

I agree with the majority that this case is sad, but I would add the adjective "frustrating." I have no idea whether Michelle Conover[1] should have visitation with Jaxon—the evidence adduced in the circuit court creates, at the very least, a fair dispute about whether visitation would be in Jaxon's best interest. But unlike every other divorce case with child visitation in dispute that I have encountered in my time on this Court, we don't, and can't, even reach the question of *Jaxon*'s best interests. I agree with the majority that *Janice M. v. Margaret K.*, 404 Md. 661 (2008) compels this conclusion and that we, as our State's intermediate appellate court, are not at liberty to hold otherwise. However, the General Assembly's intervening recognition of same-sex marriages, *see* The Civil Marriage Protection Act, 2012 Md. Laws Ch. 2, raises doubt about whether a divorcing same-sex *spouse* should begin the visitation analysis as a third party to her non-biological non-adopted child, as the same-sex partner in *Janice M*. did and Michelle does here.[2]

## I.

Although the parties are both women, this is a divorce case, and a relatively simple one on the surface. It started with Brittany's complaint, which Michelle answered, and evolved with Michelle's counter-complaint. Their form pleadings established that both

---

[1] I will follow the majority's convention of referring to the parties by their first names, purely for clarity and meaning no disrespect.

[2] I agree with the majority that broader constitutional questions about the continuing validity of our State's parenthood and child legitimacy statutes were neither raised nor decided in the circuit court, and therefore that we should not reach them.

wanted a divorce, that neither sought support or alimony from the other, and that Michelle was not seeking custody.[3] The only real dispute was whether Michelle was entitled to any visitation with Jaxon.

Brittany took the position, and the circuit court ultimately agreed, that Michelle is a third party vis-à-vis Jaxon, not a parent. This difference matters tremendously. If Michelle is a parent, her right to visitation depends on Jaxon's best interests, and the court presumes that his interests are furthered by some sort of ongoing relationship with his non-custodial parent. *See Boswell v. Boswell*, 352 Md. 204, 220 (1998) ("As to visitation, the non-custodial parent has a right to liberal visitation with his or her child 'at reasonable times and under reasonable conditions,' but this right is not absolute." (citation omitted)); *Michael Gerald D. v. Roseann B.*, 220 Md. App. 669, 680 (2014) ("[A]s a general rule, a parent, who is not granted custody, will be given 'a right to liberal visitation with his or her child at reasonable times and under reasonable conditions.'" (citation omitted)). And in reality, it is pretty hard to deprive a parent of *all* visitation, as it should be. *See, e.g.*, *Michael Gerald D.*, 220 Md. App. at 680-85. As a third party, however, she must surmount a difficult burden before the court even reaches Jaxon's best interests: she must prove that Brittany either is unfit or that extraordinary circumstances justify judicial intrusion into Brittany's right to parent Jaxon. *Compare McDermott v. Dougherty*, 385 Md. 320 (2005) (holding that father's absence from the life of his son, which occurred when father was out

---

[3] The pleadings don't address the fact that Brittany had custody of Jaxon, but Michelle admitted as much during the hearing and custody is not in dispute.

2

at sea for months at a time while employed as a merchant marine, did not constitute exceptional circumstances that would warrant transfer of child custody) *with Koshko v. Haining*, 398 Md. 404 (2007) (holding that grandparents petitioning for visitation are first required to show *prima facie* evidence of parental unfitness or exceptional circumstances before a trial court applies the best interest of the child standard) and *In re Victoria C.*, 437 Md. 567 (2014) (holding that sibling's request for visitation was governed by the third-party visitation rule). That standard makes sense when the visitation request comes from a true third party, *i.e.*, from someone outside the nuclear family relationship that the divorce proceeding will divide.

At the risk of oversimplifying the obvious, the rights and obligations of parenthood have arisen historically from a person's contribution of biological material at the time of conception, by marriage, or by legal adoption. The classic and easiest example has always been the married opposite-sex couple, but the law has developed ways of defining and assigning parental status irrespective of marriage altogether. Indeed, when the dispute relates to a child's financial support, Maryland law provides a specific mechanism for determining "legitimacy," a concept that extends the *obligations* (not rights, more on this below) of parenthood to parents (typically fathers) of children not born of a recognized marriage. *See* Md. Code (1984, 2012 Repl. Vol.), §§ 5-1005-48 of the Family Law Article ("FL") (creating "Legitimation proceedings").

But the definitions of parenthood tied to marriage, biology or formal adoption don't map neatly onto same-sex relationships, especially same-sex relationships formed in the

3

hundreds of years before our State (finally) recognized the rights of two men or two women to marry. And biology, at least as we now know it, prevents two men or two women from conceiving and birthing a child themselves. So same-sex couple-led families have had to adapt, and children become part of their families in a variety of ways. Some couples adopt. Some couples, like Brittany and Michelle, might have one become pregnant by artificial insemination; others might donate sperm and have a surrogate carry the baby to term. Of course, these same methods are available to opposite-sex couples too, and have been all along. *See, e.g.*, *Sieglein v. Schmidt*, No. 2616, September Term 2013 (Md. App. August 25, 2015), slip op. at 20-21 (child conceived by *in vitro* fertilization or artificial insemination with consent and born during marriage is child of both spouses, even if sperm and egg both came from donors). From a legal perspective, though, differentiations between same-sex spouses on the basis of their relative biological roles will *always* disadvantage the spouse who didn't contribute sperm, egg, or uterus.

Here, the couple decided to use donor sperm to impregnate Brittany, who carried and gave birth to Jaxon. That makes Brittany his biological mother and, out of the womb, his parent. His biological father was a sperm donor who relinquished any parental rights, a fertility mechanism known and understood in our law.

So, who is Michelle to Jaxon? It depends. From a practical, day-to-day perspective, evidence before the circuit court portrayed Michelle as Jaxon's parent, at least for the first part of his life. Brittany and Michelle were together for seven years before they decided to have a child together. Michelle was involved in helping to select Jaxon's sperm donor,

4

someone with physical characteristics like hers.  Jaxon's full name includes both of their last names. They lived together as a family for the first seventeen months of Jaxon's life, and both Jaxon and Brittany referred to Michelle in dad-like terms.  Michelle also had visitation with Jaxon for nine months after they separated.

Legally, though, she doesn't fit any of the historic paradigms.  Had Michelle and Brittany been married at the time Jaxon was born, the case might be closer, but they weren't; indeed, at the time he was conceived in 2009, they *couldn't* marry in the District of Columbia, where they lived, or in Maryland, or anywhere other than Connecticut, Iowa, or Massachusetts.[4]  Michelle probably could have adopted Jaxon,[5] but hadn't at the time their relationship fell apart, and Michelle testified that they couldn't afford it.  The closest analogy is that Michelle is Jaxon's stepparent, but that doesn't really work either—Jaxon

---

[4] Or The Netherlands, Belgium, Canada, Spain, South Africa, Norway, or Sweden. *See* "Gay Marriage Around The World," Pew Research Center, Religion & Public Life, http://www.pewforum.org/2015/06/26/gay-marriage-around-the-world-2013/, last visited August 14, 2015.

The majority holds the couple's failure to marry in another state before conception against them, but I wouldn't.  Michelle and Brittany had long been a couple when they decided to conceive and bring Jaxon into their home, and they could not have known with any confidence in 2009 whether the District of Columbia (or Maryland) *ever* would allow them to get married or recognize an out-of-state same-sex wedding from elsewhere.

[5] I say "probably" because although there is no statutory impediment to same-sex second-parent adoption, it appears that no *holding* of the Court of Appeals has recognized them—indeed, as recently as 2012, the Court has acknowledged that it *hasn't* yet recognized them.  *Port v. Cowan*, 426 Md. 435, 452 n.19 (2012); *see also Janice M.*, 404 Md. at 665 n.3; *but compare Conaway v. Deane*, 401 Md. 219, 334-36 (2007) (Raker, J., concurring and dissenting) (expressing the view that FL § 5-3A-29 permits same-sex couples to adopt).

did not come to the family along with Brittany from outside, but came into the world in the context of the relationship at issue in this divorce case.

Before same-sex couples could marry, our courts were asked to recognize the person in Michelle's shoes here as a *de facto* parent—someone who did not fit the traditional definition of parent, but who had a connection with the child that justified a best interests analysis without a threshold finding of unfitness or extraordinary circumstances. This Court did so twice, first in *S.F. v. M.D.*, 132 Md. App. 99 (2000), and again when *Janice M.* stopped here *en route* to the Court of Appeals. 171 Md. App. 528 (2006). The Court of Appeals expressly declined to adopt *de facto* parenthood, however, in *Janice M.*, 404 Md. 661 (2008). That case presented a nearly identical situation—a two-woman couple who brought a daughter into their family through adoption, and only one of whom was a legal adopting parent. When they split up, the non-adoptive woman sought visitation, and argued that she was the daughter's *de facto* parent (on a record that supported visitation more unambiguously than this one). The Court's reluctance to recognize that status turned in large measure on the inability to limit the concept of *de facto* parenthood in a manner consistent with *Troxel v. Granville*, 530 U.S. 57 (2000), *McDermott*, or *Koshko*:

> The visitation dispute in this case arises in the context of two women. We are mindful of the extensive literature in the law reviews on the issue of visitation rights for same-sex partners when their relationships have terminated and especially the difficulties, in some states, that same-sex partners experience when custody or visitation is at issue. *The issues inherent in this disagreement, however, are not limited to same-sex couples and could arise in a myriad of other*

> *circumstances, including disputes involving step-parents, grandparents, and parties in a relationship with "a significant other."* At oral argument, we inquired of the parties, whether the fact that the parties were of the same sex in the case before the Court should have any bearing on our analysis. Neither argued that it should. Janice M. would embrace a single test for all third parties and would give no special consideration to same-sex partners. Margaret K., when asked, also did not argue for a different test for same-sex couples. Indeed, she acknowledged that, while there is no explicit legal or statutory authority in Maryland for adoption under the circumstances presented herein, she could have petitioned to become a second-party adoptive parent to Maya.

404 Md. at 686 (emphasis added). The Court also distinguished the law of other states, most notably Minnesota, which had at that time recognized *de facto* parent visitation by statute. *See id*. at 686-89 (discussing *SooHoo v. Johnson*, 731 N.W.2d 815 (Minn. 2007)).

*Janice M*.'s holding—that the non-biological, non-adoptive same-sex *partner* is a third party for custody purposes—compels us to hold here that Michelle is a third party to Jaxon for purposes of the visitation analysis, and thus that the circuit court did not err in concluding that it first had to find exceptional circumstances before considering Jaxon's best interests. But the premise underlying *Janice M*.'s rejection of *de facto* parenthood—that the concept can't be limited to same-sex couples—no longer holds, at least with regard to *married* same-sex couples. If, as Maryland law now provides, a valid marriage between two women (or two men) has the same legal validity and force as a man-woman marriage, courts should analyze the visitation rights of same-sex spouses the same way they analyze

7

the visitation rights of opposite-sex spouses. I acknowledge that there may well be some challenges in adapting our analyses to accommodate the real-life differences in the way children join same-sex families, but it may not be that hard either,[6] and we have to start somewhere.

## II.

I agree as well that Michelle cannot back into a finding of parenthood via FL § 5-1005 and Md. Code (1974, 2011 Repl. Vol.), § 1-208 of the Estates and Trusts Article ("ET"), statutes designed to establish paternity for the purposes of inheritance and financial support. I wonder, though, how the case might have come out if Brittany had sought financial support from Michelle and the court had analyzed Michelle's "fatherhood" against the express legislative policy that it is "socially necessary and desirable" to secure the same support, care, and education for children born out of wedlock as those born within marriages. ET § 5-1002. Under ET § 1-208, Brittany would only need to prove that Michelle satisfied one of four potential indicia of "fatherhood," and putting aside the gender discrepancy, the evidence before the circuit court could support a straight-face finding that Michelle satisfied three of them:

> A child born to parents who have not participated in a marriage ceremony with each other shall be considered the child of his father only if the father:

---

[6] *See* "Divorce—Whether Same-Sex Marital Infidelity Can Qualify As Adultery For Purposes of Family Law Provisions Governing Divorce," 100 Op. Att'y Gen. 105 (July 24, 2015).

(1) Has been judicially determined to be the father in an action brought under the statutes relating to paternity proceedings;

(2) *Has acknowledged himself, in writing, to be the father*;

(3) *Has openly and notoriously recognized the child to be his child*; **or**

(4) *Has subsequently married the mother and has acknowledged himself, orally or in writing, to be the father*.

(Emphases added).

I don't mean to conflate these notions of parenthood. My only point is the visceral one: if this divorce case had included a request by Brittany for child support from Michelle as well as the dispute over visitation, the court might well have faced the possibility that Michelle qualified as Jaxon's "father" with regard to support but stood as a third party with regard to visitation. Or, perhaps, a finding of "fatherhood" for support purposes might have informed the court's exceptional circumstances analysis. Either way, the greater potential for this sort of dichotomy in the context of a same-sex divorce confirms my instinct that the historic treatment of same-sex parenthood is no longer up to the task.